Merrimack
No. 97-001

CLAREMONT SCHOOL DISTRICT & a.

v.

GOVERNOR & a.

(*Accountability*)

Argued: January 3, 2002
Submitted: February 1, 2002
Opinion Issued: April 11, 2002

*Stein, Volinsky & Callaghan, P.A.*, of Concord (*Andru H. Volinsky* and *Scott F. Johnson* on the supplemental memorandum, and *Mr. Volinsky* orally), and *John E. Tobin, Jr.*, of Concord, on the supplemental memorandum, for the plaintiffs.

*Philip T. McLaughlin*, attorney general (*Anne M. Edwards*, senior assistant attorney general, and *Andrew B. Livernois*, assistant attorney general, on the supplemental memorandum, and *Mr. McLaughlin* orally), and *Hale & Dorr LLP*, of Boston, Massachusetts (*Stephen A. Jonas & a.* on the supplemental memorandum), for the State.

*Richard J. Lehmann*, senate legal counsel, and *Betsy B. Miller*, house legal counsel, by memorandum for the President of the New Hampshire Senate and the Speaker of the New Hampshire House of Representatives, as *amici curiae*.

*James F. Allmendinger*, of Concord, staff attorney, by supplemental memorandum for NEA – New Hampshire, as *amicus curiae*.

*Eugene M. Van Loan III*, of Manchester, by memorandum, *pro se*, as *amicus curiae*.

*W. Gordon Allen*, of Antrim, by memorandum, *pro se*, as *amicus curiae*.

*Kenneth E. Blevens, Sr.*, of Bow, by memorandum, *pro se*, as *amicus curiae*.

*Joseph F. Hoffman*, of Gilford, by memorandum, *pro se*, as *amicus curiae*.

DUGGAN, J. The issues before this court are: (1) whether the State's obligation to provide a constitutionally adequate public education requires it to include standards of accountability in the educational system; and, if so, (2) whether existing statutes, regulations and/or rules satisfy this obligation. We hold that accountability is an essential component of the State's duty and that the existing statutory scheme has deficiencies that are inconsistent with the State's duty to provide a constitutionally adequate education.

## I

This litigation began in 1992 when the Claremont School District, along with four other "property poor" school districts, five school children and five taxpayers, filed a petition for declaratory relief in superior court alleging that the system by which the State financed education violated the New Hampshire Constitution. The trial court dismissed the lawsuit, ruling that the New Hampshire Constitution "imposes no qualitative standard of

education which must be met" and "imposes no quantifiable financial duty regarding education." *Claremont School Dist. v. Governor*, 138 N.H. 183, 185 (1993) *(Claremont I)*. The plaintiffs appealed. After examining the meaning of the words used in the Encouragement of Literature Clause at the time the State Constitution was adopted in 1784, historical evidence of the significance of education to the constitutional framers and the interpretation given almost identical language in the Massachusetts Constitution by that State's highest court, this court concluded that Part II, Article 83 requires the State to "provide a constitutionally adequate education to every educable child in the public schools in New Hampshire and to guarantee adequate funding." *Id.* at 184.

In *Claremont I*, we observed that the New Hampshire Constitution "expressly recognizes education as a cornerstone of our democratic system" and the Encouragement of Literature Clause "expressly recognizes that a free government is dependent for its survival on citizens who are able to participate intelligently in the political, economic, and social functions of our system." *Id.* at 192. "Given the complexities of our society today, the State's constitutional duty extends beyond mere reading, writing and arithmetic. It also includes broad educational opportunities needed in today's society to prepare citizens for their role as participants and as potential competitors in today's marketplace of ideas." *Id.*

This court specifically acknowledged that the task of defining the parameters of the education mandated by the constitution is in the first instance for the legislature and the Governor. *Id.* That task includes the "responsibility . . . to defin[e] the specifics of, and the appropriate means to provide through public education, the knowledge and learning essential to the preservation of a free government." *Id.* at 193.

On remand for trial in the superior court, the State defended both the adequacy of public education and the constitutionality of the property taxes used to fund it. The trial court erroneously accepted a definition of educational adequacy developed by the State Board of Education and further ruled that the property tax system used to finance public education did not violate the State Constitution. The trial court's latter ruling was premised on its conclusion that property taxes for schools were local taxes, which were proportional and reasonable within each taxing district.

On appeal, this court held that any property tax assessed to fulfill the State's obligation to provide a constitutionally adequate public education was, in fact, a State tax and not a local one, and therefore the existing public education financing system was based on disproportionate and unreasonable taxes in violation of Part II, Article 5. *See Claremont School Dist. v. Governor*, 142 N.H. 462, 466 (1997) *(Claremont II)*. This holding

was based on evidence established at trial that to support public schools, taxpayers in some towns were paying property taxes at rates almost 400 percent higher than taxpayers in other towns. *Id.* at 470.

Regarding educational adequacy, the opinion underscored that

> [m]ere competence in the basics – reading, writing, and arithmetic – is insufficient in the waning days of the twentieth century to insure that this State's public school students are fully integrated into the world around them. A broad exposure to the social, economic, scientific, technological, and political realities of today's society is essential for our students to compete, contribute, and flourish in the twenty-first century.

*Id.* at 474. *Claremont II* also set forth "seven criteria … establishing general, aspirational guidelines for defining educational adequacy." *Id.* at 474-75. This court deferred, however, in the first instance to the other branches of government to "promptly develop and adopt specific criteria implementing these guidelines." *Id.* at 475.

In May 1998, the senate sought an opinion of the justices on questions concerning the constitutionality of "an act implementing the Advancing Better Classrooms program to provide a constitutionally adequate public education," which was proposed in response to *Claremont II*. *Opinion of the Justices (School Financing)*, 142 N.H. 892 (1998). This legislation – originating as house bill 1075 and commonly referred to as the ABC plan – contained, among other things, accountability and assistance provisions that required the department of education to determine whether schools were providing a constitutionally adequate education by assessing their progress towards meeting "quality standards" and the State's minimum standards for school approval. If a school did not meet these standards, or was not making "measurable progress" towards meeting these standards, the department of education was required to provide assistance to the school. A legislative oversight committee was established to review State education policy and to ensure that the ABC program was working as intended.

The comments of the attorney general filed with the court supporting the constitutionality of the ABC plan provide insight into the State's position regarding the necessary elements of educational adequacy and the need to include a mechanism of accountability. The attorney general's office noted that "*Claremont II* requires that the Legislature define the components of a constitutionally adequate education and give specific substantive content to a program for delivering such an education." The attorney general's office supported the ABC plan because it "defines a constitutionally adequate education that will be measured by outputs

which show that New Hampshire students have the essential knowledge and skills to pursue higher education and participate successfully in society." As the State characterized the legislation, it "uses the existing system to the fullest extent possible and, through additional accountability, assistance, and enforcement provisions, ensures the provision of a constitutionally adequate education." Under this bill, whether a school is meeting education goals would "be measured through each school's performance on the State assessment test and other locally administered standardized tests; achievement of its performance goals and local performance indicators as described in its local education improvement and assessment plan; and its compliance with the school approval standards." The attorney general's office concluded that the ABC plan "provides accountability for the education that is being delivered to the students of this State."

Attached to the comments of the attorney general was the report of the Governor's Task Force on Educational Adequacy. This report emphasized that "necessary accountability measures must be in place so that school districts that excel are recognized and those that underperform are provided with appropriate support and mentoring programs to bring these districts up to acceptable standards." Accordingly, in her testimony before the house finance and education committees in support of the ABC legislation, Governor Shaheen underscored that a strength of the legislation was that "it . . . sets in place a collaborative effort between the state and local communities to ensure that there is performance and accountability in the schools."

Elizabeth Twomey, commissioner of the department of education, likewise testified that "along with adequacy of education what was determined to be needed was also performance and accountability concerns." She supported the legislation because "in defining adequacy of education through a very thoughtful citizen driven process, to couple that with performance and accountability . . . and to further establish some committees to continue to analyze some of the more problematic areas . . . we believe that the components in this bill will go a long way to help us address all of our concerns in order to provide the best education we can."

After reviewing the ABC legislation, this court concluded that the tax abatement portion of the legislation violated Part II, Article 5 of the State Constitution. *Opinion of the Justices (School Financing)*, 142 N.H. at 902. We noted, however,

> the commendable steps taken by the Governor and legislature in reaching their definition of a constitutionally adequate education. The legislature's involvement of a broad cross-section of the

> community in the process can only lead to a definition that will serve this State's school-age citizens well as they journey toward achievement in the world around them.

*Id.* at 903.

Following this decision, neither chamber of the legislature could agree on an education funding system. A conference committee appointed by the president of the senate and the speaker of the house reached a compromise and agreed to the provisions enacted in Laws 1998, chapter 389 and now codified at RSA chapter 193-E (1999). The accountability provisions were not included in the new legislation.

The State then requested a two-year extension of the deadlines established in *Claremont II* for enacting a constitutional funding system. *See Claremont School Dist. v. Governor (Motion for Extension of Deadlines)*, 143 N.H. 154 (1998). The plaintiffs in turn asked this court to declare the State's definition of adequacy unconstitutional. The plaintiffs argued that because the new legislation did not include accountability measures, "the most salient deficiency in the . . . definition of adequacy . . . is that it does not require the State to determine if its schools are providing an adequate education, nor provide any method by which the State could make such a determination." According to the plaintiffs, the definition was insufficient as a matter of law because it did not meet the mandate in *Claremont II*.

The State responded that the definition adopted in RSA 193-E:2 defined a constitutionally adequate education but that "the Legislature . . . needs to be given time to build on that progress to develop a system to deliver an adequate education." The State explained that

> [RSA 193-E:2] fulfills the first part of the State's obligation under *Claremont II* to adopt a definition of a constitutionally adequate education. The State acknowledges that the second requirement of the Court's mandate – developing a system to ensure delivery of a constitutionally adequate education – has not yet been achieved by the Legislature. A system for delivery that would respond to the second educational mandate in *Claremont II* was developed and approved by the House in its amended version of [the ABC plan]. That system was removed from [the legislation] before the bill became law.

At oral argument, the State represented that it "will guarantee when it is done with the process . . . that the opportunities [to receive an adequate education] are there, that there are sufficient standards, accountability, and funding. There can be no other guarantee."

This court denied the plaintiffs' request to declare the State's definition of adequacy unconstitutional. We stated that

> [w]hile the adequacy legislation, [RSA chapter 193-E], adopts a statutory definition of an adequate education, the State specifically acknowledges that the legislature has yet to achieve "a system to ensure delivery of a constitutionally adequate education." Because the State concedes that it has not completed its efforts to define and implement a constitutionally adequate education as required by *Claremont II*, we decline the present invitation to determine whether the definition adopted is facially unconstitutional.

*Claremont v. Governor (Motion for Extension of Deadlines)*, 143 N.H. at 159-60.

In October 1999, this court determined that a proposal to phase in a statewide property tax to fund education was unconstitutional. *See Claremont School Dist. v. Governor (Statewide Property Tax Phase-In)*, 144 N.H. 210 (1999). The plaintiffs requested at that time that we assign to a master for fact-finding the question, "what is the definition of a constitutionally adequate education." *Id.* at 212. The State objected, noting that "[t]he Legislature has defined adequacy [RSA 193-E:2] and is making progress on developing a delivery and accountability system which in part will address how to determine if a school or district is providing an adequate education." The State characterized *Claremont II* as issuing four mandates: "define an adequate education, determine the cost, fund it with constitutional taxes, and ensure its delivery through accountability." The State explained that

> although not all of the tasks have been completed, the legislative and executive branches have met three of the four *Claremont II* mandates and are making significant progress towards meeting the fourth.
>
> . . . .
>
> One bill introduced in the 1999 session, SB 219, contains the framework for a delivery and accountability system that would satisfy the Court's delivery system mandate in *Claremont II*.

Given the State's representations that it "is continuing to work on a delivery and accountability system that will determine which school districts are providing an adequate education and will provide support for those districts that are in need of assistance," this court denied the plaintiffs' request for the appointment of a master as "premature." *Id.* at

212. The accountability legislation referred to by the State, senate bill 219, was subsequently sent back to committee and never became law.

In December 2000, in *Opinion of the Justices (Reformed Public School Financing System)*, 145 N.H. 474, 476 (2000), this court opined that proposed legislation to fund education that would rely, in part, on local property taxes to pay for some of the cost of an adequate education would "directly contradict the mandate of Part II, Article 83, which imposes upon the State the exclusive obligation to fund a constitutionally adequate education." In the opinion, we reiterated the core holdings from earlier *Claremont* rulings and pointed out that constitutional adequacy had "yet to be defined." *Id.* at 478.

> It is not possible to determine the level of funding required to provide the children of this State with a constitutionally adequate education until its essential elements have been identified and defined. The legislature and the Governor have broad latitude to fashion the specifics. Once this critical task has been completed, it is for the legislature to adopt a funding mechanism to ensure that a constitutionally adequate education is provided.

*Id.*

Subsequently, the legislature passed senate bill 164, "an Act establishing a comprehensive statewide accountability system concerning an adequate education." In this legislation, specific test scores were established as performance goals that students had to meet. The State, however, was not required to assist schools or school districts where students did not meet the standards. Governor Shaheen vetoed the bill on July 12, 2001. In her veto message, the Governor explained:

> I have long supported strong school accountability legislation. Making schools accountable for their performance is critical to improving the education we provide our children.

> Senate Bill 164 is advertised as a school accountability bill. Yet, it contains no provisions whatsoever to hold school districts accountable for their performance. As President George W. Bush has emphasized so strongly in his national educational reform proposal, "without consequences for failure, there is no pressure to succeed." ... I cannot support legislation which is more symbolic than substantive on an issue as critically important as school accountability.

N.H.S. JOUR. 727 (2001).

In September 2001, the plaintiffs filed a motion to invoke jurisdiction and declare the State's system for funding public education unconstitutional. The plaintiffs sought an order from this court declaring "that the State has not met its constitutional obligation to define an adequate education that includes a system for implementation" and that RSA 198:40 (1999), the provision for funding an adequate education, is "unconstitutional on its face." The State objected, stating that it "has fully complied with the Constitution's demands regarding educational funding. The State has defined an adequate education, has developed a system to ensure delivery of an adequate education and has funded the system with reasonable and proportional state taxes." The State sought an order denying the plaintiffs' motion, declaring the current educational funding statutes constitutional on their face, and entering final judgment.

On December 4, 2001, this court ordered oral argument "on the question whether the court should invoke its continuing jurisdiction to determine whether the State has met its obligation to define an adequate education." Because the pleading filed by the plaintiffs asking us to exercise our jurisdiction raised other factual questions, we denied the remainder of the plaintiffs' motion without prejudice to their seeking relief in the superior court.

After considering the pleadings and oral argument, this court decided to exercise its jurisdiction to resolve two specific legal questions:

(1) Whether the State's obligation to provide a constitutionally adequate public education under part II, article 83 of the New Hampshire Constitution requires the State to include standards of accountability in New Hampshire statutes, regulations and/or rules; and if so

(2) Whether existing statutes, regulations and/or rules satisfy this obligation.

The parties were given additional time to provide supplemental briefing on these issues.

## II

In their memorandum, the plaintiffs argue that the State has already conceded that the *Claremont* holdings require accountability. The plaintiffs point to the State's acknowledgements during the *Claremont* litigation that it needed to develop a system of accountability to ensure delivery of a constitutionally adequate education. *See Claremont v. Governor (Motion for Extension of Deadlines)*, 143 N.H. at 159-60. In light of these concessions and the State's repeated representations to this

court that it was continuing to work on developing such a system, the plaintiffs contend the State cannot now rely on the statutes, regulations and rules that were in place before the *Claremont* decisions to satisfy the accountability requirement.

The plaintiffs, however, do not assert that the doctrine of estoppel should prevent the State from arguing that the existing statutes, regulations and rules satisfy its obligation. Furthermore, the fact that the State adopted many of the statutes, regulations and rules before our *Claremont* decisions does not prevent the State from arguing that on their face they are constitutionally sufficient. Therefore, rather than deciding this case based on the State's prior representations, action or inaction, we prefer to decide this case by applying the relevant law.

The State contends that whether they are obligated to include "standards of accountability" "depends on the meaning of the phrase." The State explains that if "standards of accountability" means the existence of a system to deliver an adequate education, then it agrees that it is obligated to include such standards and further contends that the existing statutes, regulations and rules comply with this requirement. The State is essentially arguing that it is only accountable for devising a system to deliver a constitutionally adequate education. This reformulation of the issue, however, serves only to circumvent the question whether the State is obligated to adopt standards of accountability to *ensure* delivery of a constitutionally adequate education.

 Accountability is more than merely creating a system to deliver an adequate education. *Claremont I* did not simply hold that the State should deliver a constitutionally adequate education, but in fact held that it is the State's duty under the New Hampshire Constitution to do so. *See Claremont I*, 138 N.H. at 184 (interpreting Part II, Article 83 of the State Constitution). Accountability means that the State must provide a definition of a constitutionally adequate education, the definition must have standards, and the standards must be subject to meaningful application so that it is possible to determine whether, in delegating its obligation to provide a constitutionally adequate education, the State has fulfilled its duty. *See Velishka v. Nashua*, 99 N.H. 161, 167 (1954) (to avoid charge of unlawfully delegated legislative power, statute must lay down basic standards and a reasonably definite policy for the administration of the law); *DeRolph v. State*, 728 N.E.2d 993, 1019 (Ohio 2000) (State's constitutional duty to provide system of common schools requires "statewide standards that are fully developed, clearly stated, and understood by educators, students, and parents"); *Abbott by Abbott v. Burke*, 693 A.2d 417, 427 (N.J. 1997) ("comprehensive statutory and

administrative system for public education founded on standards that define the substantive meaning of education and that provide for measures of educational performance and achievement ... are consistent with the Constitution's education clause"). If the State cannot be held accountable for fulfilling its duty, the duty creates no obligation and is no longer a duty. *See, e.g., Fish v. Homestead Woolen Mills,* 134 N.H. 361, 365 (1991) (holding one cannot be held accountable where no legal duty exists). We therefore conclude that the State's duty to provide a constitutionally adequate education includes accountability.

This conclusion is consistent with the responses of the executive and legislative branches to the *Claremont* decisions. As recounted above, representations made by the attorney general and efforts made by the Governor and legislature illustrate that the *Claremont* decisions have been generally interpreted to require some form of accountability. Indeed, in 1993 the legislature created an assessment system that would "generate data ... to provide a basis for accountability." RSA 193-C:3, IV(h) (1999). Thus, the legislature's response to *Claremont* demonstrates that it also views accountability as a logical corollary to the State's duty to provide a constitutionally adequate education.

This view is shared by other jurisdictions. In Massachusetts, for example, in response to *McDuffy v. Secretary of Executive Office of Education,* 615 N.E.2d 516 (Mass. 1993), the legislature promulgated a system of accountability whereby the state board of education was given authority to establish specific performance standards and a program for remediation when students' test scores fall below a certain level. *See* Mass. Gen. Laws Ann., ch. 69, §1B, §1I (1996). In Ohio, the state supreme court stated that "accountability is an important component of [the educational system]." *DeRolph,* 728 N.E.2d at 1018. In New Jersey, the state supreme court noted that the existence of standards alone is insufficient if "[t]he standards themselves do not ensure any substantive level of achievement." *Abbott by Abbott,* 693 A.2d at 428. In Tennessee, the state supreme court said that "[t]he essentials of the governance provisions of the [Basic Educational Program] are mandatory performance standards; local management within established principles; performance audits that objectively measure results; ... and final responsibility upon the State officials for an effective educational system throughout the State." *Tenn. Small School Systems v. McWherter,* 894 S.W.2d 734, 739 (Tenn. 1995); *see also Board of Educ. of Boone County v. Bushee,* 889 S.W.2d 809, 816 (Ky. 1994) ("State government is held accountable for providing adequate funding and for the overall success of the common school system."). It is thus widely accepted that establishing standards of accountability is part of the State's duty to provide a constitutionally adequate education.

## III

Having determined that standards of accountability are an essential component of the State's duty to provide a constitutionally adequate education, we must now determine whether the existing statutes, regulations and rules satisfy this obligation. The State argues that these existing laws, which include the definition of an adequate education in RSA 193-E:2; the State's minimum standards for education set forth in the department of education rules, N.H. ADMIN. RULES, Ed ch. 300; and the New Hampshire Education Improvement and Assessment Program (NHEIAP), RSA ch. 193-C (1999), together provide sufficient standards of accountability. According to the State, "it has given detailed curriculum instruction to schools and school boards, created a test to measure student performance, empowered State agencies to review and improve school performance, and enacted literally thousands of pages of other statutes, regulations, and rules to deliver an adequate education."

The starting point for analyzing the system is RSA 21-N:1, II(c) (2000), which states that "[t]he paramount goal of the state shall be to provide an adequate education for all school-age children in the state, consistent with RSA 193-E." RSA 193-E:1, I, provides:

> It is the policy of the state of New Hampshire that public elementary and secondary education shall provide all students with the opportunity to acquire the knowledge and skills necessary to prepare them for successful participation in the social, economic, scientific, technological, and political systems of a free government, now and in the years to come; an education that is consistent with the curriculum and student proficiency standards specified in state school approval rules and New Hampshire curriculum frameworks.

RSA 193-E:2 sets forth the criteria for an adequate education as follows:

I. Skill in reading, writing, and speaking English to enable them to communicate effectively and think creatively and critically.

II. Skill in mathematics and familiarity with methods of science to enable them to analyze information, solve problems, and make rational decisions.

III. Knowledge of the biological, physical, and earth sciences to enable them to understand and appreciate the world around them.

IV. Knowledge of civics and government, economics, geography, and history to enable them to participate in the democratic process and to make informed choices as responsible citizens.

V. Grounding in the arts, languages, and literature to enable them to appreciate our cultural heritage and develop lifelong interests and involvement in these areas.

VI. Sound wellness and environmental practices to enable them to enhance their own well-being, as well as that of others.

VII. Skills for lifelong learning, including interpersonal and technological skills, to enable them to learn, work, and participate effectively in a changing society.

The State contends that a wide range of satisfactory methods can produce an effective system to deliver what it has defined as an adequate education. The State also asserts that it may choose from a wide array of tools to ensure that school districts are implementing the standards it sets out for the system it chooses. We agree that "there are many different ways that the Legislature could fashion an educational system while still meeting the mandates of the Constitution." The system the State currently has in place appears to use both standards based on what school districts provide (input-based standards) and results that school districts achieve (output-based standards). While minimum standards for school approval set forth what the schools, at the very least, must provide to students, NHEIAP uses curriculum frameworks and mandatory tests to assess what the school districts have achieved. The plaintiffs argue that despite these programs, "the State has failed to meet its obligation to promulgate standards because the standards in place are voluntary, unconstitutional, and do not set any specific levels of performance that schools or school districts must meet." We examine each of these programs in turn.

*A. Minimum Standards*

The State argues that as a central part of the system to deliver a constitutionally adequate education, it "dictates certain school approval standards that schools and school districts must meet. These input based standards are enforceable by the State and extend to virtually every aspect of education, from class size to teacher training to detailed curriculum requirements."

The board of education is required by statute to adopt rules relative to "[m]inimum curriculum and educational standards for all grades of the public schools." RSA 186:8, I (1999); *see also* RSA 21-N:9 (2000). These rules are commonly referred to as the State's "minimum standards" or

"school approval standards." The minimum standards contain a number of requirements imposed by the State on local school districts so that schools may be approved by the State. For example, the minimum standards set forth the number of days in a standard school year, staff qualifications, maximum class sizes, heating and ventilation requirements, the minimum number of credits required to be offered in certain courses, and the areas of specific substantive materials which must be taught. *See* N.H. ADMIN. RULES, Ed 302.01-306.41.

The education that the individual schools provide is measured against these standards for approval. *Id.* 306.40. If a school does not meet these standards, it can lose its approval. *Id.* There are four categories of approval: approved with distinction, approved, conditionally approved from one to three years, and unapproved. *Id.* 306.40(b)(1)-(4). If a school is unapproved, the department of education is required to work with the local school board to "correct all deficiencies until such time as an unapproved school meets all applicable standards and is designated as an approved school." *Id.* 306.40(b)(5). The purpose of these rules is to hold school districts accountable for providing an adequate education.

RSA 194:23-c (1999), however, provides that "[t]he state board of education shall have the power to approve for a reasonable period of time a high school that does not fully meet the requirements of RSA 194:23 if in its judgment the financial condition of the school district or other circumstances warrant delay in full compliance." Pursuant to this statute, N.H. ADMIN. RULES, Ed 306.41(a) provides that

> [n]otwithstanding any other provision of these rules and in accordance with the provisions of RSA 194:23-c, the state board of education shall have the power to approve, for a period of 1 year, a school, although it does not fully meet the requirements for an approved school, as established in these rules, if the financial condition of the school district or other emergency conditions justify delay in full compliance.

The financial or emergency conditions which justify a school's or school district's excusal from compliance with the minimum standards include: "(1) Reduction in local tax base; (2) Closing of a major industry; (3) Sudden influx of school-age population; (4) Emergency beyond the control of the school district, such as fire or natural disaster; or (5) Other financial or emergency condition not listed above." *Id.* 306.41(c). The plaintiffs contend that the minimum standards are insufficient to comply with the State's duty to ensure a constitutionally adequate education because by "the express language of Ed 306.41, districts that are too poor to comply with

the standards are excused from compliance with the modest standards of the program."

On their face, RSA 194:23-c and N.H. ADMIN. RULES, Ed 306.41(a) permit a school district to provide less than an adequate education as measured by these minimum standards when the local tax base cannot supply sufficient funds to meet the standards. The statute and the rule also permit noncompliance with the standards under emergency conditions, such as a fire or natural disaster. While it may be permissible to excuse noncompliance under emergency conditions, the statute permits the board of education to also approve a school that does not meet the minimum standards based solely on the "financial condition of the school district." RSA 194:23-c.

Excused noncompliance with the minimum standards for financial reasons alone directly conflicts with the constitutional command that the State must guarantee sufficient funding to ensure that school districts can provide a constitutionally adequate education. As we have repeatedly held, it is the State's duty to guarantee the funding necessary to provide a constitutionally adequate education to every educable child in the public schools in the State. *Claremont I*, 138 N.H. at 184.

> The responsibility for ensuring the provision of an adequate public education and an adequate level of resources for all students in New Hampshire lies with the State. While local governments may be required, in part, to support public schools, it is the responsibility of the State to take such steps as may be required in each instance effectively to devise a plan and sources of funds sufficient to meet the constitutional mandate.

*Claremont II*, 142 N.H. at 475-76 (quotation and brackets omitted).

There is no accountability when the rules on their face tolerate noncompliance with the duty to provide a constitutionally adequate education. While the State may delegate this duty, *see Claremont II*, 142 N.H. at 476, it must do so in a manner that does not abdicate the constitutional duty it owes to the people, *see State v. Hayes*, 61 N.H. 264, 327 (1881). The State's duty cannot be relieved by the constraints of a school district's tax base or other financial condition. *See Claremont II*, 142 N.H. at 470-71. Apparently the dissenting opinion agrees with this conclusion.

The plaintiffs also allege that, as applied, the minimum standards are insufficient because for the 2001-2002 school year, sixteen schools, including seven high schools, have been granted delays in coming into full compliance with the minimum standards. Although this status is supposed to last for only one year, N.H. ADMIN. RULES, Ed 306.41(a), at least two

elementary schools have been in the "delay in full compliance" category for three years. In all, a total of 12,898 school children in New Hampshire are attending schools that have been granted delayed compliance with the minimum standards. The issue before us, however, does not turn on the particular facts alleged. Rather, the only issue is whether the existing statutes on their face comply with the constitution.

■ As noted above, the State may not take the position that the minimum standards form an essential component of the delivery of a constitutionally adequate education and yet allow for the financial constraints of a school or school district to excuse compliance with those very standards. We hold, therefore, that to the extent the minimum standards for school approval excuse compliance solely based on financial conditions, it is facially insufficient because it is in clear conflict with the State's duty to provide a constitutionally adequate education. *See Niemiec v. King*, 109 N.H. 586, 587 (1969) (statutes are presumed constitutional and will not be declared invalid except upon unescapable grounds).

*B. New Hampshire Education Improvement and Assessment Program*

NHEIAP, RSA chapter 193-C, is characterized by the State as "[a]nother important element of the State's system for delivering the opportunity for an adequate education." The goals of the program are to define what students should know and be able to do, develop and implement methods for assessing that learning and its application, report assessment results to all citizens of New Hampshire, help to provide accountability at all levels, and use the results, at both the State and local levels, to improve instruction and advance student learning. RSA 193-C:3, I(a)-(e). The department of education pamphlet describes NHEIAP as the "cornerstone of the state's initiatives to continuously improve education for all students."

The responsibility for administering NHEIAP lies with the department of education. RSA 193-C:3. The commissioner of education is charged with "develop[ing] and implement[ing] this program in conjunction with the state board of education and the legislative oversight committee." *Id.* In fulfilling its duty pursuant to the statutory framework that makes up NHEIAP, the department of education is directed to develop a program that consists of three interlocking components. *See* RSA 193-C:3, I. The first component is a set of educational standards, RSA 193-C:3, III(a), which the department of education has developed and implemented through curriculum frameworks. The second component is a statewide assessment program, which "shall be [a] valid and appropriate representation[] of the standards the students are expected to achieve."

RSA 193-C:3, III(b). The final component is the "local education improvement and assessment plan which builds upon and complements the goals established for [NHEIAP]." RSA 193-C:9, I.

The first component, curriculum frameworks that represent the educational standards, is described by the State as "detailed blueprints, which apply to students in kindergarten through 12th grade, defin[ing] what New Hampshire students should know and be able to do at the completion of different levels of their education." The curriculum frameworks, covering more than 700 printed pages, establish lengthy, comprehensive and "challenging benchmarks" in the subject areas tested. RSA 193-C:1, VI. The department of education has developed curriculum frameworks for each of the subject areas described in RSA 193-C:5 – reading, language arts, mathematics, science, history and geography.

The second component is the statewide assessment that the department of education is required to administer each year in all school districts in an elementary school grade, a middle school or junior high school grade, and a high school grade. *See* RSA 193-C:6. The assessment tests are directly tied to "curriculum frameworks and are designed to measure whether students are meeting the ambitious standards set forth in those frameworks." The department of education has established four levels of achievement in each subject area – novice, basic, proficient and advanced. According to the department of education, "Students who score at the basic level have successfully demonstrated that they have learned fundamental information and skills. Students at the proficient and advanced levels have demonstrated the attainment of a wide range of knowledge as well as the ability to apply that knowledge."

The final component, a local education improvement and assessment plan for an individual school district, is developed and implemented based on assessment results. RSA 193-C:9, II(a). Through the local improvement assistance program, the department of education "use[s] funds appropriated for th[e] program to provide technical assistance and training to school districts in developing and implementing local education improvement and assessment plans based on assessment results." *Id.* The "[f]unds shall be utilized to support school districts in the use of local and statewide assessment results to improve instruction and enhance student learning, and to identify and implement methods and models of instruction that have proven to be effective in helping students reach the educational standards identified in the New Hampshire curricular framework." RSA 193-C:9, II(b). This local education improvement assistance program places a "strong emphasis . . . on identifying model teachers in the areas included in the statewide education improvement and assessment program and providing them with opportunities to share their expertise and

enthusiasm with local educators and community members in developing local education improvement and assessment plans." RSA 193-C:9, II(c).

In enacting NHEIAP, the legislature recognized that "[i]mprovement and accountability in education are of primary concern to all the citizens of New Hampshire." RSA 193-C:1, I. The statute specifically states that one of "[t]he aims of this program shall be to ... [h]elp to provide accountability at all levels." RSA 193-C:3, I. The program set forth in RSA chapter 193-C, accordingly, is intended to "serve[] as an effective measure of accountability." RSA 193-C:1, II.

As a measure of accountability, the statute delegates the task of establishing a set of educational standards to the department of education. *See* RSA 193-C:3. The department of education, in turn, created the curriculum frameworks, which "define what New Hampshire students should know and be able to do at the completion of different levels of their education." The assessment "tests, administered at the end of grades three, six, and ten, are developed around the curriculum frameworks and provide vital data that help[] identify strengths in an educational program as well as areas that need improvement."

While the curriculum frameworks developed pursuant to RSA 193-C:3 define what students should know and be able to do, none of the provisions in RSA chapter 193-C refers to the statutory scheme that sets out the criteria for and the delivery of an adequate education, RSA chapter 193-E. RSA 193-E:3, entitled "Delivery of an Adequate Education," however, requires each school district to report to the department of education its data for the previous twelve months on performance indicators including each school's "[p]erformance on [the statewide assessment] tests administered pursuant to RSA 193-C and other standardized tests administered at local option," attendance and drop-out rates, school environment indicators, and the proportion of graduating students going on to post-secondary education, military service, and the workplace. RSA 193-E:3, I(a). Using this data, the department of education must "issue a report on the condition of education statewide and on a district-by-district and school-by-school basis." RSA 193-E:3, II. The report, which includes the performance data provided by the school districts, must compare the condition of each district to the district's prior condition and State averages. *Id.* The report must also provide statewide rankings of each district and school on the statewide assessment tests administered pursuant to RSA chapter 193-C. *Id.* RSA 193-E:3, II further requires that "[t]he report shall be organized and presented in a manner that is easily understood by the public and that assists each school district with the identification of trends, strengths, and weaknesses and the development of its local education improvement and assessment plan."

While the avowed purpose of RSA chapter 193-C is to provide accountability, the statute, together with the reporting requirements of RSA chapter 193-E, is limited to providing: (1) the development of educational standards; (2) statewide assessment through testing; and (3) an opportunity to use the reported assessment results in developing a local education improvement plan. Although the tests measure student performance against the educational standards, the principal use of the assessment results is to generate and compile data. According to the department of education, the "NHEIAP results provide each school and each school district with information on its academic strengths and weaknesses. This allows the community and school district to discuss local results, and then develop a local educational improvement plan for their school or district."

Under RSA 193-C:9, I, however, no school district is required to respond to the assessment results; rather "[e]ach school district in New Hampshire is *encouraged* to develop a local education improvement and assessment plan." (Emphasis added.) This means that even if the assessment results show that all the students in a school are at novice level, neither the school district nor the department of education is required to do anything. Whether an individual school district is providing a constitutionally adequate education or not, it is merely encouraged to develop a local educational improvement plan, and if it opts to do so, the department of education is available to assist. Nothing more is required.

■ An output-based accountability system that merely encourages local school districts to meet educational standards does not fulfill the State's constitutional duty under Part II, Article 83. While the State may delegate its duty to provide a constitutionally adequate education, the State may not abdicate its duty in the process. *See Hayes*, 61 N.H. at 327; *Claremont II*, 142 N.H. at 475 (declaring "the State cannot use local control as a justification for allowing the existence of educational services below the level of constitutional adequacy"). The purpose of meaningful accountability is to ensure that those entrusted with the duty of delivering a constitutionally adequate education are fulfilling that duty. *See Ferretti v. Jackson*, 88 N.H. 296, 304 (1936). When the State chooses to use an output-based tool to measure whether school districts are providing a constitutionally adequate education, that tool must be meaningfully applied. The department of education cannot meaningfully apply the educational standards and assessment tests set out in RSA chapter 193-C when it cannot hold school districts accountable, but instead is limited to using the results to encourage school districts to develop a local education improvement and assessment plan. To the extent the State relies on RSA

chapter 193-C to provide for accountability, it must do more than merely encourage school districts to meet the educational standards that are designed to indicate whether students are receiving a constitutionally adequate education.

The State suggests that "[a] student who receives an education of the quality described in [RSA] 193-E:2 and who acquires all of the various skills and types of knowledge expressed there would be well prepared as a citizen to participate in society." While we have no basis to disagree with this statement, the State has not provided a sufficient mechanism to require that school districts actually achieve this goal. We hold that because of deficiencies in the system as set out in this opinion, the State has not met its constitutional obligation to develop a system to ensure the delivery of a constitutionally adequate education.

## IV

As the State recognizes, "there are many different ways that the Legislature could fashion an educational system while still meeting the mandates of the Constitution." The development of meaningful standards of accountability is a task for which the legislative branch is uniquely suited. The policy choices to be made are complex, as there are several ways to address this issue. *See, e.g.*, Koski, *Educational Opportunity and Accountability in an Era of Standards-Based School Reform*, 12 STAN. L. & POL'Y REV. 301 (2001); Comment, *Beyond School Financing: Defining the Constitutional Right to an Adequate Education*, 78 N.C. L. REV. 399 (2000). It is for the Governor and the legislature to choose how to measure or evaluate whether a constitutionally adequate education is being provided and what action to take if a school is determined to be deficient. The State's brief describes some of the issues involved:

> Formulating a system for delivery might ... require policy choices regarding what sort of standards should exist for teachers, students, schools, and school districts. For example, a delivery system might consist of detailed curriculum rules for each grade and subject area establishing the required substance of each lesson that students must be taught. Other delivery systems might make use of any number of other standards such as class size, graduation rate, college acceptance rate, test scores, or teacher qualifications.

> ... [D]evising a system to deliver educational services could also require decisions regarding how to implement the standards that are selected. If a school or school district is not

meeting applicable standards, what will be the consequence? A
system could rely on the Governor to ensure that local school
districts are meeting statutory obligations through her power
to enforce constitutional and statutory obligations. A different
system might enforce standards by rewarding successful
schools with increased funding. Alternatively, the system might
impose penalties for not meeting standards, such as removing
the principal, sending in a team of administrators to take
control of the school, or any number of other consequences.

We agree with the State's contention that it may implement a variety of
systems. However, when the State chooses a particular method to
determine whether those it entrusts with the task are in fact providing a
constitutionally adequate education, the State must include meaningful
accountability to ensure that the State is fulfilling its constitutional duty.

As the State has previously recognized,

[T]he legislative and executive branches are responsible for
crafting and implementing a long-term solution to the problems
with the educational funding system found by this Court. This
Court is responsible for deciding whether the Legislature has
adopted a satisfactory definition and for determining that the
Legislature has finished its initial tasks under *Claremont II*, or
that it needs to do more work.

We conclude that the State "needs to do more work" to fulfill its duty to
provide a constitutionally adequate education and incorporate meaningful
accountability in the education system. In light of the procedural history of
this litigation, including efforts by the executive and legislative branches
and their previous statements on this issue, and the application of settled
law, this conclusion should be neither surprising nor unanticipated.

We underscore that this court has consistently declined to determine
whether the State's definition of an adequate education is constitutional.
*See Claremont 1*, 138 N.H. at 192 (declining to define the parameters of the
education mandated by the constitution because that task is "in the first
instance, for the legislature and the Governor"); *Claremont School Dist. v.
Governor (Motion for Extension of Deadlines)*, 143 N.H. at 159 (declining
invitation to determine whether definition of an adequate education is
facially unconstitutional because State's work is not complete); *Claremont
School Dist. v. Governor (Statewide Property Tax Phase-In)*, 144 N.H. at
212 (denying without prejudice plaintiffs' motion to assign a master for
fact-finding to determine the definition of a constitutionally adequate
education). This issue is not before us now.

We remain mindful that "[w]hile the judiciary has the duty to construe and interpret the word 'education' by providing broad constitutional guidelines, the Legislature is obligated to give specific substantive content to the word and to the program it deems necessary to provide that 'education' within the broad guidelines." *Claremont II*, 142 N.H. at 475. We recognize that we are not appointed to establish educational policy and have not done so today.

V

In 1993, after holding that Part II, Article 83 imposes a duty on the State to provide a constitutionally adequate education to every educable child in the public schools and to guarantee adequate funding, we remanded the case for further proceedings. *Claremont I*, 138 N.H. at 184. In 1997, we held that the system for financing elementary and secondary public education in the State was unconstitutional and that the legislature must define and implement a system to provide a constitutionally adequate education. *Claremont II*, 142 N.H. at 465, 476. Rather than remanding the case, we retained jurisdiction. *Id.* at 476.

Since that time, both parties have availed themselves of our continuing jurisdiction and sought opinions directly from this court. For example, in March 1998, a member of the defendant board of education moved to vacate the decision in *Claremont II* on the grounds that Justice Batchelder's participation violated Part I, Article 35 and Part II, Article 78 of the New Hampshire Constitution and RSA 490:3 (1997). *Claremont School Dist. v. Governor (Motion to Vacate)*, 142 N.H. 737 (1998). In November 1998, the State filed a motion for extension of deadlines imposed in *Claremont II*. *Claremont School Dist. v. Governor (Motion for Extension of Deadlines)*, 143 N.H. at 155. In September 1999, the plaintiffs challenged the constitutionality of Laws 1999, chapter 17, an act establishing an education property tax. *Claremont School Dist. v. Governor (Statewide Property Tax Phase-In)*, 144 N.H. at 212. In December 1999, we awarded attorney's fees to the plaintiffs and held that sovereign immunity barred an award of costs. *Claremont School Dist. v. Governor (Costs and Attorney's Fees)*, 144 N.H. 590, 591 (1999). In addition, we have issued opinions of the justices on three occasions. *Opinion of the Justices (School Financing)*, 142 N.H. 892; *Opinion of the Justices (Tax Plan Referendum)*, 143 N.H. 429 (1999); *Opinion of the Justices (Reformed Public School Financing System)*, 145 N.H. 474.

Therefore, in the nearly nine years since this court issued the decision in *Claremont I*, we have rendered eight subsequent opinions directly related to that initial decision. In each of these decisions, this court considered whether the actions of the State conformed to the governing constitutional

principles expressed in *Claremont I* and *Claremont II* that the State must provide and fund a constitutionally adequate public education. At no time has this court deviated from the holdings in *Claremont I* and *Claremont II* or their constitutional underpinnings.

In the matter currently before us, the plaintiffs requested a ruling on several claims. The plaintiffs argued that the current funding provisions for an adequate education, RSA 198:40, are unconstitutional because: (1) the funding amounts are not based on a complete definition of an adequate education; (2) the State assessment test relied on by the State to infer the cost of an adequate education does not assess all the criteria in RSA chapter 193-E; (3) the cost of an adequate education does not include school buildings and other capital costs; (4) the additional 9.75 percent discount from the base per pupil cost is arbitrary; and (5) the funding formula contained in RSA 198:40 contains arbitrary exclusions and limitations that force local school districts to pay for the State's adequacy duty through *de facto* State taxes whose rates are disproportionate in violation of Part II, Article 5 of the State Constitution. This court denied the plaintiffs' request to invoke jurisdiction as to these issues because they raise factual questions not properly before us. The plaintiffs were allowed to seek resolution of these issues in the superior court.

We exercised our jurisdiction to review two important, specific legal issues concerning the State's duty to include standards of accountability in the educational system and have now decided those issues. While this court may entertain, in the first instance, unresolved constitutional questions arising from this litigation, issues requiring factual development and determination should be resolved in the superior court.

We remain hopeful that the legislative and executive branches will continue to work to satisfy their constitutional duty to ensure the delivery of a constitutionally adequate education to the public school students of this State. As in the past, we are confident that the legislature and the Governor will fulfill their responsibility "to provide through public education, the knowledge and learning essential to the preservation of a free government." *Claremont I*, 138 N.H. at 193.

*So ordered.*

BROCK, C.J., and BRODERICK, J., concurred; NADEAU and DALIANIS, JJ., dissented.

NADEAU, J., and DALIANIS, J., dissenting. We believe that existing statutes, regulations and rules provide for sufficient accountability to withstand a facial constitutional challenge.

It seems obvious to us that accountability is presumptively a part of *any* governmental obligation, including the State's obligation to provide a constitutionally adequate education, and is necessarily provided by the adjudicative, legislative, and elective processes. If individuals believe their constitutional or statutory rights have been violated, they may seek redress from the adjudicative process. Surely it is the role of the courts to fashion and impose remedies if and when the State violates the law. If individuals believe that the legislative or executive branches are unresponsive to their concerns, they may seek change through the elective or legislative process. It is up to the citizens of New Hampshire to express their views concerning educational policy and funding by electing officials who support those views, and by seeking legislation and administrative rules which implement them.

The majority now defines "accountability" to mean that "the State must provide a definition of an adequate education, the definition must have standards, and the standards must be subject to meaningful application so that it is possible to determine whether ... the State has fulfilled its duty," although this definition does not appear in and is not required by any of the court's *Claremont* decisions. We believe that existing laws, rules and regulations regarding the State's duty to provide a constitutionally adequate education are sufficient and that the majority's definition of accountability exceeds what is constitutionally required.

RSA 193-E:1 (1999) describes an adequate education as one that provides "students with the opportunity to acquire the knowledge and skills necessary to prepare them for successful participation in the social, economic, scientific, technological, and political systems of a free government, now and in the years to come" and "is consistent with the curriculum and student proficiency standards specified in state school approval rules and New Hampshire curriculum frameworks." RSA 193-E:2 (1999) specifies the requisite skills which an adequate education gives students the opportunity to acquire. Together these statutes amply define the term "adequate education."

The standards for an adequate education are set forth in the minimum curriculum and education standards adopted by the board of education pursuant to RSA 186:8 (1999) and RSA 21-N:9 (2000). These standards govern not only how schools must be organized and staffed, but also set forth detailed substantive educational content. *See* N.H. ADMIN. RULES, Ed 302.01-306.41. If a school fails to meet these standards, it risks losing approval by the department of education, in which case the department is required to work with the local school board to correct the deficiencies. *See id.* 306.40.

Finally, RSA 193-E:3 (1999) provides a constitutionally sufficient mechanism by which "to determine whether the State has fulfilled its duty." The statute requires each school district to report extensive data for the previous year on its district and school performance indicators. The New Hampshire Department of Education is then required to issue an annual report on the condition of education statewide and on a district-by-district and school-by-school basis that includes all of the information reported by the districts as well as statewide rankings of each district and school on the State tests administered under RSA chapter 193-C and on certain other standardized tests. The report compares the condition of each district to its prior condition and to State averages. RSA 193-E:3, II.

The majority faults the State's entire program of minimum standards for school approval because of *one* statute, RSA 194:23-c (1999), and its implementing regulation, N.H. ADMIN. RULES, Ed 306.41, concluding that they are unconstitutional because they conflict with the State's obligation to fund an adequate education. We disagree.

This court must construe statutes so as "to avoid conflict with constitutional rights whenever reasonably possible." *State v. Morrill*, 123 N.H. 707, 713 (1983) (quotation omitted). The authority to permit a school to delay complying with the minimum standards necessarily is limited by the State's constitutional duty to fund an adequate education. *See Appeal of Public Serv. Co. of N.H.*, 122 N.H. 919, 922 (1982). Thus, RSA 194:23-c must be construed to permit a school to delay complying with minimum standards only for reasons that are not inconsistent with the court's *Claremont* decisions. *See id.*

The majority also concludes that the New Hampshire Education Improvement and Assessment Program (NHEIAP) is constitutionally infirm because it encourages, but does not require, schools to adopt local education improvement and assessment plans. We disagree.

First, we do not view the NHEIAP as part of the State's constitutional mandate to provide a constitutionally adequate education. The content of a constitutionally adequate education is set forth in the State's minimum curriculum and education standards, not in the more expansive curriculum frameworks that are part of the NHEIAP.

Second, we believe that encouraging local school districts to adopt local education improvement and assessment plans is entirely consistent with the State's obligation to provide a constitutionally adequate education. As the court noted in *Claremont School District v. Governor*, 142 N.H. 462, 475 (1997) (*Claremont II*), the legislature is free to "authoriz[e] local school districts to dedicate additional resources to their schools or to develop educational programs beyond those required for a constitutionally adequate public education."

The majority speaks in terms of "standards of accountability," reasoning that they are required, in part, because the duty to provide an adequate education is imposed by the constitution. But the constitution imposes many duties upon the State, and the court has never before interpreted it to require the State to adopt specific "standards of accountability" as a prerequisite to fulfilling these duties. We see no reason to require this of the State today with respect to its duty to provide an adequate education.

The majority reasons, also, that accountability standards are constitutionally required because if we cannot determine whether the State has fulfilled its duty, the duty does not exist. Whether or not the State adopts so-called "standards of accountability," the duty to provide an adequate education exists because the constitution requires it. *See Claremont School Dist. v. Governor*, 138 N.H. 183, 184 (1993) (*Claremont I*). The common law negligence case cited by the majority for this proposition, *Fish v. Homestead Woolen Mills*, 134 N.H. 361 (1991), is simply not on point.

We believe that by deciding the State is required to set standards that when applied indicate whether the school districts are providing an adequate education and hold those school districts accountable, the majority moves unnecessarily into the province of the legislative and executive branches. While it certainly makes sense for the State to adopt "standards of accountability," in our view the court should not order or oversee such action. Nor should the court sit in continuous judgment over educational policy decisions made by the legislature and the Governor, which may very well be a consequence of today's decision.

The time has come for the supreme court to conclude its jurisdiction over this appeal. In *Claremont I*, 138 N.H. at 184, 193, the court fulfilled its constitutional responsibility in the first instance, by defining the State's constitutional obligation to provide and fund an adequate education. The court recognized, nevertheless, that it was not its responsibility to define the parameters of a constitutionally mandated education because that task is initially for the legislature and the Governor. *Id.* at 192. We believe the State has fulfilled its responsibility to give substantive content to the word "education" and to the program by which it seeks to provide that education. *See Claremont II*, 142 N.H. at 475. Accordingly, the docket in this appeal should now be closed.

For all of the above reasons, therefore, respectfully, we dissent.