Hillsborough-southern judicial district
No. 2006-258

LONDONDERRY SCHOOL DISTRICT SAU #12 & a.

v.

STATE OF NEW HAMPSHIRE

Argued: June 22, 2006
Opinion Issued: September 8, 2006

*Orr & Reno, P.A.*, of Concord (*William L. Chapman & a.* on the brief, and *Mr. Chapman* orally), for the plaintiffs.

*Kelly A. Ayotte*, attorney general (*Anne M. Edwards*, associate attorney general, and *N. William Delker*, senior assistant attorney general, on the brief, and *Ms. Edwards* orally), for the State.

*Patrick E. Donovan* and *Kenneth D. Murphy*, of Concord (*Mr. Donovan* and *Mr. Murphy* on the brief, and *Mr. Murphy* orally), for the Speaker of the New Hampshire House of Representatives and the President of the New Hampshire Senate, as *amici curiae.*

*Bernstein, Shur, Sawyer & Nelson, P.A.*, of Manchester (*Andru H. Volinsky* on the brief), and *John E. Tobin, Jr.*, of Concord, and *Scott Johnson*, of Concord, on the brief, for the Claremont Petitioners, as *amici curiae.*

*Theodore E. Comstock*, of Concord, executive director and general counsel, and *Barrett M. Christina*, of Concord, staff attorney, on the brief, for New Hampshire School Boards Association, as *amicus curiae.*

*James F. Allmendinger*, of Concord, staff attorney, on the brief, for NEA-New Hampshire, as *amicus curiae.*

*Eugene M. Van Loan III*, of Manchester, by brief, *pro se*, as *amicus curiae.*

*Soltani/Mosca P.L.L.C.*, of Epsom (*Edward C. Mosca* on the brief), for Granite State Taxpayers, as *amicus curiae.*

HICKS, J. Once again, we are called upon to address the basic educational needs of the children of New Hampshire and the State's obligation to ensure and to fund each educable child's opportunity to obtain a constitutionally adequate education as required by Part II, Article 83 of the New Hampshire Constitution.

The State appeals a decision of the Superior Court (*Groff*, J.) finding that the State has failed to fulfill its duty to define a constitutionally adequate education, failed to determine the cost of an adequate education, and failed to satisfy the requirement of accountability, and that House Bill 616 (the current education funding law) creates a non-uniform tax rate in violation of Part II, Article 5 of the New Hampshire Constitution. We affirm the trial court's finding that the State has failed to define a constitutionally adequate education and stay consideration of its remaining findings.

I

The plaintiffs, Londonderry School District School Administrative Unit (SAU) #12, Merrimack School District SAU #26 and New Hampshire Communities for Adequate Funding of Education, a non-profit organization consisting of nineteen school administrative units and towns, filed a petition for declaratory relief in this court in 2005 seeking a determination that House Bill 616 is unconstitutional. After considering the parties' briefs regarding whether we should exercise our original jurisdiction, we concluded that "while substantial questions of constitutional law are presented by this case, we believe further factual development is necessary in the superior court before those questions are decided." Accordingly, the plaintiffs' action was dismissed without prejudice.

The plaintiffs then filed a petition for declaratory relief and a motion for summary judgment in the superior court challenging the constitutionality of House Bill 616 on grounds that the statute: (1) fails to define, determine the cost of, and ensure delivery of a constitutionally adequate education; (2) requires a number of municipalities to fund a constitutionally adequate education through local taxes; (3) all but eliminates so-called "donor communities" and imposes an unreasonable and disproportionate tax burden on property-poor municipalities with respect to the funding of education; and (4) creates a class of former donor communities that retain all the revenue they raise through the statewide enhanced education tax, resulting in a violation of equal protection. The trial court found House Bill 616 unconstitutional on its face and granted the motion for summary judgment.

II

In *Claremont School District v. Governor (Accountability)*, 147 N.H. 499, 505 (2002), we acknowledged the State's assertion that *Claremont School District v. Governor*, 142 N.H. 462 (1997) (*Claremont II*) issued "four mandates: define an adequate education, determine the cost, fund it

with constitutional taxes, and ensure its delivery through accountability," and that these four mandates comprise the State's duty to provide an adequate education. We focus here upon the first mandate: defining a constitutionally adequate education.

Since the inception of the education cases in 1993, we have consistently deferred to the legislature's prerogative to define a constitutionally adequate education. In *Claremont School District v. Governor*, 138 N.H. 183 (1993) (*Claremont I*), we stated that "[w]e do not define the parameters of the education mandated by the constitution as that task is, in the first instance, for the legislature and the Governor." *Id.* at 192. We expressed our confidence that the legislature and the Governor would "fulfill their responsibility with respect to defining the specifics of, and the appropriate means to provide through public education, the knowledge and learning essential to the preservation of a free government." *Id.* at 193.

In *Claremont II*, we looked to "the seven criteria articulated by the Supreme Court of Kentucky as establishing *general, aspirational guidelines* for defining educational adequacy." *Claremont II*, 142 N.H. at 474 (emphasis added). We expressly viewed these guidelines as "benchmarks of a constitutionally adequate public education" and "anticipate[d] that [the other branches of government would] promptly develop and adopt specific criteria implementing these guidelines." *Id.* at 475. As we explained, "[w]hile the judiciary has the duty to construe and interpret the word 'education' by providing broad constitutional guidelines, the Legislature is obligated to give *specific substantive content* to the word and to the program it deems necessary to provide that 'education' within the broad guidelines," *id.* (quotation omitted; emphasis added), all consistent with the duties imposed by Part II, Article 83.

In *Claremont School District v. Governor (Motion for Extension of Deadlines)*, 143 N.H. 154 (1998), the State acknowledged that the legislature had yet to achieve "a system to ensure delivery of a constitutionally adequate education." *Id.* at 160 (quotation omitted). We, therefore, "declined the . . . invitation to determine whether the definition adopted is facially unconstitutional." *Id.* In *Claremont School District v. Governor (Statewide Property Tax Phase-In)*, 144 N.H. 210 (1999), we denied as premature the plaintiffs' request to assign a master for purposes of fact-finding to determine the definition of a constitutionally adequate education. *Id.* at 212; *cf. Pauley v. Bailey*, 324 S.E.2d 128 (W. Va. 1984) (on remand, trial court appointed special master to oversee development of master plan for constitutional adequacy). In *Opinion of the Justices (Reformed Public School Financing System)*, 145 N.H. 474 (2000), we noted that constitutional adequacy had yet to be defined and that "[t]he

content of a constitutionally adequate education must be defined, in the first instance, by the legislature." *Id.* at 478.

## III

Today, the State argues that it has defined a constitutionally adequate education in RSA 193-E:2 (Supp. 2005). That statute, titled "Criteria for an Equitable Education," provides:

An equitable education shall provide all students with the opportunity to acquire:

I. Skill in reading, writing, and speaking English to enable them to communicate effectively and think creatively and critically.

II. Skill in mathematics and familiarity with methods of science to enable them to analyze information, solve problems, and make rational decisions.

III. Knowledge of the biological, physical, and earth sciences to enable them to understand and appreciate the world around them.

IV. Knowledge of civics and government, economics, geography, and history to enable them to participate in the democratic process and to make informed choices as responsible citizens.

V. Grounding in the arts, languages, and literature to enable them to appreciate our cultural heritage and develop lifelong interest and involvement in these areas.

VI. Sound wellness and environmental practices to enable them to enhance their own well-being, as well as that of others.

VII. Skills for lifelong learning, including interpersonal and technological skills, to enable them to learn, work, and participate effectively in a changing society.

RSA 193-E:2.

The State argues that this definition of adequacy "accords with the definitions upheld by the judiciaries of other states around the nation," citing West Virginia, Kentucky, Montana and Washington. An examination of the cases and statutes in those states, however, reveals otherwise. In West Virginia, for example, an action was brought by parents of school

children contending that the system for financing public schools violated that state's constitutional guarantee of a "thorough and efficient" education. *Pauley v. Kelly*, 255 S.E.2d 859, 861 (W. Va. 1979) (quotation omitted). Although the state supreme court of appeals remanded the case "for further evidentiary development," because the case involved "significant and far-reaching public issues," *id.* at 863, the court proposed certain guidelines to the trial court, including identifying the parameters of a "[t]horough and [e]fficient" educational system, ultimately holding that the legislature has the constitutional duty "to develop a high quality Statewide education system." *Id.* at 861. On remand the trial court found that the State had failed "to perform its constitutional and statutory duties with respect to formulating high quality standards for education" because the standards promulgated by the board of education were "far too general and minimal to define the elements of a thorough and efficient system of education." *Pauley v. Bailey*, 324 S.E.2d at 132 (quotation omitted). The trial court appointed a special master to oversee the development of an educational master plan that contained "an extensive compilation of detailed concepts and standards that defines the educational role of the various state and local agencies, sets forth specific elements of educational programs, enunciates consideration for educational facilities and proposes changes in the educational financing system." *Id.*

Similarly, in Kentucky, a group of school districts and public school students brought an action challenging whether the Kentucky General Assembly had complied with its constitutional mandate to "provide an efficient system of common schools throughout the state." *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 189-90 (Ky. 1989) (quotation omitted). The state supreme court declared the system of common schools to be constitutionally deficient and directed the legislature to "re-create . . . and re-establish a system of common schools within this state which will be in compliance with the Constitution." *Id.* at 214. In doing so, the court set out standards for a new system, including identifying seven "capacities" with which each and every child was to be provided through an efficient system of education. *Id.* at 212. The court indicated that the seven characteristics "should be considered as *minimum* goals in providing an adequate education." *Id.* at 214 n.22. The Kentucky legislature subsequently enacted the Kentucky Education Reform Act of 1990, "which radically changed the system of public education" in that state. *Chapman v. Gorman*, 839 S.W.2d 232, 234 (Ky. 1992).

In Montana and Washington, although the applicable statutes contain general definitions of an adequate education, in each state the legislation defines the substantive content of the educational program implementing the general definitions. In Montana, the legislature established five "goals"

for public elementary and secondary schools. Mont. Code. Ann. § 20-1-102 (2005). The statutory scheme also identifies "the minimum standards upon which a basic system of free quality public elementary and secondary schools is built," and the "educationally relevant" factors the legislature must consider. Mont. Code Ann. §§ 20-9-309(2)(a), (3); *see* Mont. Code Ann. § 20-9-309(4)(b)(i) (2005).

In Washington, the state supreme court interpreted the constitutional provision that "[i]t is the paramount duty of the state to make ample provision for the education of all children residing within its borders," as creating a judicially enforceable, affirmative duty. *Seattle Sch. Dist. No. 1 of King Cty. v. State*, 585 P.2d 71, 83, 85 (Wa. 1978) (quotation and emphasis omitted). The court held that pursuant to that duty, the legislature has the responsibility to define and give content to a basic education and a basic program of education. *Id.* at 95. The "Basic Education Act," codified in the Washington statutes, requires each school district "to provide opportunities for all students to develop" essential knowledge and skills in four broad categories. Wash. Rev. Code § 28A.150.210 (2004). The state board of education is required to establish a program that includes "the essential academic learning requirements . . . and such other subjects and such activities as the school district shall determine to be appropriate for the education of the school district's children," Wash. Rev. Code § 28A.150.220(1)(a), (b), and to "adopt rules to implement and ensure compliance with the program requirements," Wash. Rev. Code § 28A.150.220(4). *See also* Mass. Gen. Laws Ann. ch. 69, § 1 (West 1996) (intent of statute is to provide "public education system of sufficient quality to extend to all children the opportunity to reach their full potential and to lead lives as participants in the political and social life of the commonwealth and as contributors to its economy"), § 1B (duties of the board of education), § 1D (statewide educational goals and academic standards), § 1E (curriculum frameworks), § 1I (performance reports, evaluation system and assessments); *Hancock v. Commissioner of Educ.*, 822 N.E.2d 1134, 1137-38 (Mass. 2005) (Massachusetts Education Reform Act of 1993 established uniform, objective performance and accountability measures for every public school student, teacher, administrator, school and district in the state). Therefore, although each state noted above provides, as part of a comprehensive statutory scheme, a general definition of an adequate education, each state also establishes a mechanism through which educational content is identified in fulfillment of constitutional duties.

In the case before us, the State asserts that the system of education in New Hampshire goes well beyond constitutional adequacy. In its brief, the State argues that "statutes and regulations . . . implement [the definition of

adequacy] with a specificity that far exceeds constitutional requirements"; that by complying with the federal No Child Left Behind Act of 2001 and "establishing a comprehensive system for holding its schools accountable, the State has exceeded the constitutional requirements of accountability"; that "the annual testing and statewide performance targets . . . far exceed the constitutional standard of adequacy as defined by the legislature in RSA 193-E:2"; and that the "school approval standards go well beyond the constitutional floor of adequacy" and "far surpass the constitutional minimum of adequacy." For purposes of this appeal, we will accept these assertions. These assertions themselves, however, expose the core issue before us. If the statutory scheme that is in place provides for *more* than constitutional adequacy, then the State has yet to isolate what parts of the scheme comprise constitutional adequacy. More specifically, under the statutory scheme there is no way a citizen or a school district in this State can determine the distinct substantive content of a constitutionally adequate education. Consequently, its cost cannot be isolated. Such a system is also impervious to meaningful judicial review.

IV

The task of developing specific criteria of an adequate education is for the legislature. *Claremont II*, 142 N.H. at 475. By failing to do so, the legislature creates the potential for a situation in which a superior court judge, or a special master appointed by this court, will be required to decide what is to be taught in the public schools in order to provide the opportunity to acquire "[s]kill in reading, writing and speaking English," "[s]kill in mathematics and familiarity with methods of science," "[k]nowledge of the biological, physical, and earth sciences," "[k]nowledge of civics and government, economics, geography, and history," "[g]rounding in the arts, languages, and literature," "[s]ound wellness and environmental practices," and "[s]kills for lifelong learning." RSA 193-E:2. Similarly, to assess whether a constitutionally adequate education is being provided, a trial judge would likely have to determine the levels of "skill," "knowledge," "grounding" and "sound wellness" to which an educable child is entitled. Moreover, RSA 193-E:2 mandates that students be provided the "opportunity to acquire" such skills and knowledge. Without more, a trial judge or a special master would have to determine the adequacy of the "opportunity" to be afforded. Determining the substantive educational program that delivers a constitutionally adequate education is a task replete with policy decisions, best suited for the legislative or executive branches, not the judicial branch.

■ RSA 193-E:2 largely mirrors the seven criteria that we cited with approval in *Claremont II*, 142 N.H. at 474-75. We characterized those criteria as establishing "general" and "aspirational" guidelines for defining educational adequacy and made clear that the legislature was expected to develop and adopt *specific criteria* for implementing the guidelines. In the years since RSA 193-E:2 was adopted, this court and the State have acknowledged that constitutional adequacy has yet to be defined. Standing alone, RSA 193-E:2 does not fulfill the State's duty to define the substantive content of a constitutionally adequate education in such a manner that the citizens of this state can know what the parameters of that educational program are. The right to a constitutionally adequate education is meaningless without standards that are enforceable and reviewable. *See Claremont School Dist. v. Governor (Accountability)*, 147 N.H. at 508 (definition of constitutionally adequate education must have standards subject to meaningful application). Furthermore, without a substantive definition of constitutional adequacy, it will remain impossible for school districts, parents, and courts, not to mention the legislative and executive branches themselves, to know where the State's obligations to fund the cost of a constitutionally adequate education begin and end.

The State further argues that, aside from the constitutionally sufficient definition of adequacy in RSA 193-E:2,

> [t]he Legislature has delegated to the State Board the authority and the duty to prescribe uniform standards for all public schools in New Hampshire. RSA 194:23; RSA 186:8; RSA 21-N:9. The State Board has responded by enacting comprehensive and detailed *minimum* standards for public school approval. *See* [N.H. ADMIN. RULES] Ed 306.01 *et seq.* Local school boards are required by statute to "comply with the rules and regulations of the state board." RSA 186:5; RSA 186:8. The school approval standards are very detailed and demanding; they govern nearly every facet of a school's operation. The standards prescribe how schools must be organized and staffed as well as the particular educational content of each subject taught. *See e.g.*, [N.H. ADMIN. RULES] Ed 306.17 (setting forth maximum class sizes); [N.H. ADMIN. RULES] Ed 306.37 (detailing requirements for English program). These standards are monitored by DOE, which grades individual schools on their compliance with the standards. [N.H. ADMIN. RULES] Ed 306.40(b)(1)-(4).

(Emphasis added.)

If it is the State's position that RSA 193-E:2 together with the education rules and regulations, curriculum frameworks and other statutes define a

constitutionally adequate education, we defer to the legislature's judgment. We note, however, that if the current system of delivery in combination with the statutory definition establishes a constitutionally adequate education, there would be no need for any local education taxes as the State would be required to pay for implementing the *entire* statutory scheme. Indeed, if that is the case, we question whether $837 million, the amount currently allotted for public education under House Bill 616, is facially sufficient to fund the school system as required by that statutory scheme. Alternatively, if, as the State asserts, the education rules and regulations, curriculum frameworks and other statutes provide some level of education beyond that of a constitutionally adequate education, the point of demarcation cannot currently be determined.

■ Any definition of constitutional adequacy crafted by the political branches must be sufficiently clear to permit common understanding and allow for an objective determination of costs. Whatever the State identifies as comprising constitutional adequacy it must pay for. None of that financial obligation can be shifted to local school districts, regardless of their relative wealth or need.

V

The trial court found House Bill 616 facially unconstitutional in part because it does not contain a definition of constitutional adequacy. House Bill 616 simply modifies the adequacy aid formula. Although the State must define constitutional adequacy in accord with this opinion, House Bill 616 standing alone need not necessarily contain such a definition for the bill itself to pass constitutional muster. Viewed together, however, the current education funding and "definitional" statutory framework falls well short of the constitutional requirements established in this court's *Claremont* decisions.

Because the definition of a constitutionally adequate education is essential to all other issues, including the cost of a constitutionally adequate education and the method by which to raise the necessary funds, we stay that portion of the case containing the trial court's findings that the legislature has failed to determine the cost, failed to satisfy the requirement of accountability and established a non-uniform tax rate. As to the core definitional issues, we will retain jurisdiction with the expectation that the political branches will define with specificity the components of a constitutionally adequate education before the end of fiscal year 2007. Should they fail to do so, we will then be required to take further action to enforce the mandates of Part II, Article 83 of the New Hampshire Constitution. Such appropriate remedies may include: (1)

invalidating the funding mechanism established in House Bill 616 as set forth in the concurring opinion of Justice Galway; (2) appointing a special master to aid in the determination of the definition of a constitutionally adequate education, *see Below v. Secretary of State*, 148 N.H. 1, 2-3 (2002) ("the supreme court has been called upon to establish a new district plan for the New Hampshire Senate ... because the New Hampshire Legislature failed to [do so] following the 2000 census"); or (3) implementing the remedy outlined in the concurring opinion of Justice Duggan and remanding the case to the trial court "for further factual development and a determination of whether the State is providing sufficient funding to pay for a constitutionally adequate education."

Respectful of the roles of the legislative and executive branches, each time this court has been requested to define the substantive content of a constitutionally adequate public education, we have properly demurred. Deference, however, has its limits. We agree with Justice Galway's concern that this court or any court not take over the legislature's role in shaping educational and fiscal policy. For almost thirteen years we have refrained from doing so and continue to refrain today. However, the judiciary has a responsibility to ensure that constitutional rights not be hollowed out and, in the absence of action by other branches, a judicial remedy is not only appropriate but essential. *Petition of Below*, 151 N.H. 135 (2004).

We urge the legislature to act.

*Affirmed in part; and stayed in part.*

BRODERICK, C.J., and DALIANIS, J., concurred; DUGGAN, J., concurred specially in part and dissented in part; GALWAY, J., concurred specially in part and dissented in part.

DUGGAN, J., concurring specially in part and dissenting in part. Rather than focus on whether the State has defined a constitutionally adequate education with sufficient specificity, I believe we should focus on whether House Bill 616 provides municipalities with sufficient funding to pay for a constitutionally adequate education. A specific definition of adequacy is meaningless without a determination of its cost, and, unlike the task of defining a constitutionally adequate education, there exist concrete methodologies for determining the cost.

The sufficiency of funding in light of the cost of a constitutionally adequate education, however, is a factually-driven question appropriate for resolution through a trial. Accordingly, I would remand this case to the superior court now for a trial on that and the other related issues in this case.

I

A brief examination of the history of House Bill 616 and some of its current provisions suggests that there may be some validity to the plaintiffs' argument that the State has sidestepped its constitutional obligation to provide an adequate education.

House Bill 616 was based in large part on funding legislation that was debated during the 2003 and 2004 legislative sessions. *See* N.H.S. JOUR. ___ (June 9, 2005). During those debates, one senator acknowledged that the legislature was "only going to spend so much money, regardless of what [an] adequate education costs." N.H.S. JOUR. 1242 (2004). Another senator admitted that the legislature "arbitrarily set $428 million as the amount . . . [it was] willing to spend on an adequate education" and then "backed into figuring out how to pay for an adequate education based on the numbers[,] not based on the needs of the children of this state." *Id.* at 1262.

In a letter written to the Governor, the senate president and the speaker of the house in 2004, the attorney general raised significant and specific concerns regarding the constitutionality of that legislation. *See* Letter from Attorney General Peter Heed to Governor Benson, President Eaton, and Speaker Chandler (April 27, 2004) (reprint on file with court). Although House Bill 616 is not identical to that earlier legislation, it includes two of the features about which the attorney general was concerned: (1) House Bill 616 repeals the statutory provision calculating the cost of an adequate education, replacing it with provisions that distribute State educational aid based upon property value, *see* Laws 2005, 257:6, :22, II; and (2) the word "adequate" has been stricken throughout the statute, *see, e.g.*, Laws 2005, 257:15. *See also* Letter from Attorney General Peter Heed, *supra*. Although criticism from legislators and the attorney general regarding previous legislation certainly does not render House Bill 616 unconstitutional, it provides important context for the issues now before us.

Furthermore, various provisions of House Bill 616 appear to support the plaintiffs' claim that it does not pass constitutional muster. First, it is unclear from the statutory scheme whether the distribution of education aid is linked to providing each community with the funds necessary to provide an adequate education. Second, the substitution of "equitable" for "adequate" in RSA 193-E:2 and other statutory provisions, *see, e.g.*, Laws 2005, 257:15, calls into question whether House Bill 616 is actually designed to fund a constitutionally adequate education. Third, given that the office of the legislative budget assistant projected the statewide cost of an adequate education to be over $909 million for fiscal year 2001, *see*

*Opinion of the Justices (Reformed Public School Financing System)*, 145 N.H. 474, 476 (2000), and if, as the plaintiffs allege, the legislature appropriated only $837 million for fiscal year 2006, then there may be considerable strength to the plaintiffs' argument that the funding provided in House Bill 616 is insufficient to fund a constitutionally adequate education. That argument, however, is heavily fact-driven and requires further factual development.

## II

As explained by the majority, the plaintiffs argue that House Bill 616 is unconstitutional on a variety of grounds. The majority chooses to focus at this juncture only on what it views as the legislature's failure to define the components of a constitutionally adequate education.

The State argues that it has defined a constitutionally adequate education in RSA 193-E:2 (Supp. 2005). I acknowledge that the definition contained therein merely reflects the seven "general, aspirational guidelines for defining educational adequacy" that we articulated in *Claremont School District v. Governor*, 142 N.H. 462, 474 (1997) (hereinafter *Claremont II*). Although I agree that a further statutory articulation of the specific components of a constitutionally adequate education would certainly be more conducive to judicial review in any challenge made under any of the *Claremont II* mandates, I do not think that the statutory schemes of Montana and Washington, for example, are illustrative of any ideal to which we should instruct the legislature to aspire. Although the majority cites these two statutory schemes, among others, as demonstrating how a State might "define[] the substantive content of [an] educational program implementing [a] general definition[]" of adequacy, each statutory scheme offers a different level of specificity and neither provides meaningful guidance to the legislature as to how it should define that "substantive content." It is thus unclear to me what level of statutory specificity as to the definition of a constitutionally adequate education is compelled by the Constitution. I do not think that further legislative action regarding the definition is a prerequisite for consideration of the other issues raised in this case. Rather, I believe that RSA 193-E:2 provides a sufficient starting point.

Moreover, although *Claremont II* requires the State to define a constitutionally adequate education, determine the cost of that education, fund that education with constitutional taxes, and ensure provision of that education through accountability, *see Claremont School Dist. v. Governor (Accountability)*, 147 N.H. 499, 505 (2002), it does not create a scheme under which any single piece of education funding legislation failing to satisfy any one of the *Claremont II* mandates will automatically be

unconstitutional. I therefore respectfully disagree with Justice Galway's conclusion that House Bill 616 is rendered unconstitutional merely because it does not explicitly define the components of a constitutionally adequate education. While the obligation to articulate this definition remains, *Claremont II* does not require us to declare funding legislation unconstitutional for this reason alone.

### III

Regardless of whether the components of an adequate education have been defined with specificity, I think it is important to identify the real issue presented in this case. The central issue is not whether the State has defined a constitutionally adequate education. Rather, the plaintiffs' fundamental complaint is that, by virtue of House Bill 616, the plaintiff school districts are receiving less education funding from the State than they have received in the past. They seek to invalidate House Bill 616 so as to restore the funding that the State previously provided. The core of this appeal is the basic question of whether the State has, in House Bill 616, fulfilled its constitutional obligation to *fund* an adequate education. Accordingly, I disagree with the majority's decision to focus on the question of whether the State has satisfied its obligation to define a constitutionally adequate education.

Determining whether the State has fulfilled its constitutional obligation to fund a constitutionally adequate education cannot be done solely by examining the provisions of House Bill 616 and the limited factual record before us on appeal. Further factual development is necessary to determine whether there are municipalities that are not receiving sufficient funding from the State to pay for an adequate education. Thus, I would remand this case to the trial court for further factual development regarding whether the funding provided in House Bill 616 is sufficient to fund a constitutionally adequate education.

On remand, in order to determine whether any municipalities are receiving insufficient funding, the trial court would have to consider the cost of a constitutionally adequate education. Because neither House Bill 616 nor any other statute purports to calculate the cost of an adequate education, in the absence of any further action on the part of the legislature, it would be up to the trial court to consider that cost.

Determining the cost of a constitutionally adequate education may not be an easy task. With RSA 193-E:2 already established as the starting point for what a constitutionally adequate education must provide, it would likely fall into the hands of educational experts to inform the trial court as to whether the funding provided by the State in House Bill 616 is sufficient to fund a constitutionally adequate education. Making this determination

would be an arduous process—one far better suited for elected decision-makers rather than a single member of the judiciary.

However, courts are "well suited to interpret and safeguard constitutional rights and review challenged acts of our co-equal branches of government—not in order to make policy but in order to assure the protection of constitutional rights." *Campaign for Fiscal Equity, Inc. v. State*, 801 N.E.2d 326, 349 (N.Y. 2003) (affirming trial court's determination that state funding system failed to provide the constitutionally-required level of education in New York City and ordering the State to determine the actual cost of providing that education). We should not shy away from the need to determine the cost of a constitutionally adequate education in order to ensure that it is being funded by the State. "It is our duty to uphold and implement the New Hampshire Constitution." *Claremont II*, 142 N.H. at 475. We must act to ensure that constitutional rights are protected, and we cannot ignore the possibility that the State may not be meeting its constitutional obligation to provide an adequate education to the children of this State.

If we were to remand this case, as I suggest, the trial court would not be the first ever to consider how to determine the cost of an adequate education. Although the facts necessary to make a determination would come from experts and other witnesses' testimony, general guidance regarding computational methods exists in opinions from courts in other jurisdictions, *see, e.g., Hancock v. Driscoll*, No. 02-2978, 2004 WL 877984, at *118-29 (Mass. Super. Ct. Apr. 26, 2004) (hereinafter *Hancock I*), *report and recommendation rejected by Hancock v. Commissioner of Educ.*, 822 N.E.2d 1134, 1136-37 (Mass. 2005), and also in one legislatively-authorized study that is specific to New Hampshire, *see* J. Augenblick *et al.*, *Alternative Approaches for Determining a Base Figure and Pupil-Weighted Adjustments for Use in a School Financing System in New Hampshire* (Nov. 30, 1998), *in* FINAL REPORT OF THE ADEQUATE EDUCATION COSTS AND MUNICIPAL GRANT DISTRIBUTION COMMISSION, SB 462 (Dec. 17, 1998) (attachment B).

In *Hancock I*, a Massachusetts Superior Court judge conducted a trial for the purpose of finding facts and making recommendations to the Supreme Judicial Court of Massachusetts on the issue of whether the Commonwealth of Massachusetts was failing to provide its students "with the level and quality of education required by the Massachusetts Constitution." *Hancock I*, 2004 WL 877984, at *1. One of the many issues addressed in the report was the adequacy of state funding for education. *Id.* at *118-29. At trial, the parties presented a number of expert witnesses who testified to the various methods for determining the cost of an adequate education. *Id.* at *118.

The report describes four basic analytical models for determining the cost of adequacy. *Id.* at *118-29. The "successful schools" model identifies school districts that perform at a predetermined level according to state performance standards and, by examining the amount that those school districts spend on their core educational programs, distills a base per pupil spending figure that represents the cost of adequacy. *Id.* at *119. Another model also identifies school districts that perform at a predetermined level according to state performance standards, but rather than determine a base per pupil cost, it compares the net spending of those schools with their legislatively-defined budgets to determine whether they are spending, on average, above their legislatively-defined budgets, which would suggest that funding of only the foundation budget amount is insufficient. *Id.* at *122-24. The "professional judgment" model utilizes panels of educational experts who determine, based upon the state constitution's minimally-required skills or levels of achievement, what the necessary components are for providing such an education and, in turn, what the provision of those components will cost. *Id.* at *120-21. Finally, the "value added" analysis identifies the average statewide standardized test scores for certain demographic subgroups of students and then compares each district's expected student performance, based upon its demographic make-up, to its actual student performance to determine whether increased spending results in students performing above their expected levels. *Id.* at *124-25.

Our own legislature, in previous legislation, utilized one of the above methodologies—the "successful schools" model—in arriving at a formula to determine the cost of an adequate education in New Hampshire. *See, e.g.,* RSA 198:40 (1999) (amended 2003, 2004; repealed 2005). That statutory formulation was apparently derived from the 1998 study report prepared by John Augenblick and his colleagues. *See* FINAL REPORT OF THE ADEQUATE EDUCATION COSTS AND MUNICIPAL GRANT DISTRIBUTION COMMISSION, *supra* at 4-5.

The study report proposed four possible formulas for calculating the cost of an adequate education in New Hampshire. J. Augenblick *et al., Alternative Approaches for Determining a Base Figure and Pupil-Weighted Adjustments for Use in a School Financing System in New Hampshire, supra* at 7-10. All four formulas were based upon the "successful schools" method described above. *See id.* at 1. Each of the four formulas differed in its method of identifying "successful schools." *See id.* at 1-2. Three of the formulas identified the "successful schools" by considering a variety of input measures (*e.g.,* student-teacher ratios and starting teacher salaries) and output measures (*e.g.,* drop-out rate and performance on standardized tests). *Id.* at 7-10 & tables 1-A, 1-B. The

fourth formula identified "successful schools" based solely upon one output factor—performance on standardized tests at forty to sixty percent. *Id.* at 10.

The legislature appears to have adopted the final formula proposed in the study report. In 1999, the legislature enacted RSA 198:40 (1999), entitled "Determination of Per Pupil Adequate Education Cost and Adequate Education Grant." *See* Laws 1999, 17:41. The statute provided, in pertinent part:

I. [T]he cost per pupil shall be established using the following formula:

(a) The department of education shall calculate the base expenditure per pupil for each school district that operates an elementary school . . . . For each school district, this amount shall be divided by the average daily membership in attendance at the elementary school level to attain the base expenditure per pupil.

(b) The adequate education grant amount shall be calculated as follows:

(1) The department of education shall identify those school districts where 40 to 60 percent of the elementary pupils enrolled in the grades tested on the day testing began, achieved a scaled score [on the statewide standardized educational test], in all areas tested, equivalent to performance at the basic level or above.

(2) From the school districts identified in subparagraph I(b)(1) of this section, the department of education shall then identify those school districts that have the lowest base expenditure per pupil . . . .

(3) The department of education shall calculate the average base cost per pupil of an adequate education at the elementary school level by multiplying the base expenditure per pupil of each school district identified in subparagraph I(b)(2) of this section by the average daily membership in attendance at each of the selected school districts, and add the results across all districts selected. This sum shall then be divided by the total average daily membership in attendance at the elementary school level in all of the selected school districts and the result shall be multiplied by .9025.

II. [Defining the "weighted average daily membership in residence" for a municipality as taking into consideration various factors.]

III. For each fiscal year, the statewide cost of an adequate education for all pupils shall be calculated by multiplying the average base per pupil cost of an adequate education by the statewide weighted average daily membership in residence of pupils and then adding 70 percent of total statewide transportation costs.

RSA 198:40 (1999). House Bill 616 repealed this calculation of the cost of an adequate education in its entirety. *See* Laws 2005, 257:22, II.

While I do not necessarily endorse this particular formula for determining the cost of an adequate education, *cf. Hancock I*, 2004 WL 877984, at *119-20 & n.148 (criticizing a similar formulation as yielding illogical results, and noting that the test scores relied upon to identify "successful schools" under that formulation may not have reflected the students' level of competence as required by the constitution), I note its prior existence in order to illustrate that a legislative calculation of the cost of an adequate education is far from impossible.

In light of the foregoing, I would remand this case to the trial court for further factual development and a determination of whether the State is providing sufficient funding to pay for a constitutionally adequate education. I note that I would not expect the trial court to craft its own definition of an adequate education, or to determine with any precision the cost of providing that education to every child in the State. Rather, I would expect the trial court to begin with the seven factors articulated in *Claremont II*, and codified in RSA 193-E:2, as guidelines for the provision of an adequate education, and from there consider whether the funding provided under the current statutory scheme is sufficient to pay the cost of that education.

IV

The majority concludes that the legislature must define a constitutionally adequate education before this case is given any further consideration. In my view, however, because a number of methodologies already exist to determine the cost of a constitutionally adequate education, it would be less problematic for the legislature to determine the cost of that education than it would be for it to look to the Washington and Montana statutes for guidance to further define the components of that education. More fundamentally, even if the legislature provides a more specific definition of an adequate education, that definition is meaningless unless the legislature also determines what that specifically-defined education will cost. A legislative determination of the cost of a constitutionally adequate education would more quickly advance the

process of establishing a constitutionally sound statutory scheme for the future education of New Hampshire's children. Indeed, in my view, a legislative determination of the cost of a constitutionally adequate education using an acceptable method for determining that cost could also satisfy the need to define a constitutionally adequate education.

Hopefully, a trial will not be necessary in this case. Hopefully, in the interim, the Governor and legislature will, using an acceptable method, determine the cost of a constitutionally adequate education at a level that satisfies constitutional concerns and addresses the issues raised by the plaintiffs.

GALWAY, J., concurring specially in part and dissenting in part. I agree with the majority that the New Hampshire Legislature has not defined a constitutionally adequate education. The majority and I part ways over the remedy for this failure. The majority would retain jurisdiction of this appeal and would consider remand to the trial court, or appointment of a special master, if the legislature, by the end of fiscal year 2007, continues not to define a constitutionally adequate education. I fear that by so doing we risk taking over the legislature's role in shaping educational and fiscal policy. The judiciary should be unwilling to assume that risk. Rather than retain jurisdiction and later remand to the superior court, I believe that the court should today declare House Bill 616 unconstitutional on its face. Consistent with the plaintiffs' request, we should stay this ruling until the end of fiscal year 2007 so that school districts will receive the state funding they anticipated.

Part II, Article 83 of the New Hampshire Constitution provides: "[I]t shall be the duty of the legislators ... to cherish the interest of literature and the sciences, and ... public schools, to encourage ... public institutions ... for the promotion of agriculture, arts, sciences, commerce, trades, manufactures, and natural history of the country ...." Under Part II, Article 83, it is the legislature's duty to provide every educable child with a constitutionally adequate public education. *Claremont School Dist. v. Governor*, 138 N.H. 183, 184 (1993). A constitutionally adequate public education gives our children a safety net—a guarantee that, at a *minimum*, they will receive a state-funded constitutionally adequate education, regardless of where they live and how much money their parents earn.

Providing a constitutionally adequate education to the children of this State entails: "defin[ing] a[] [constitutionally] adequate education, determin[ing] the cost, fund[ing] it with constitutional taxes, and ensur[ing] its delivery through accountability." *Claremont School Dist. v. Governor (Accountability)*, 147 N.H. 499, 505 (2002) (quotation omitted).

This court did not impose these duties upon the legislature; they derive from our State Constitution.

As the majority finds, the legislature has yet to define a constitutionally adequate education. In 1998, it enacted RSA 193-E:2 (Supp. 2005). That year, the State admitted that it had not "completed its efforts to define and implement a constitutionally adequate education." *Claremont School Dist. v. Governor (Motion for Extension of Deadlines)*, 143 N.H. 154, 160 (1998). In this case, the State contends that RSA 193-E:2 is the definition of a constitutionally adequate education. As the majority aptly observes, the seven criteria set forth in that statute are no more than a restatement of the "general, aspirational guidelines" we quoted with approval in *Claremont School District v. Governor*, 142 N.H. 462, 474-75 (1997) (*Claremont II*). Aspirational guidelines do not provide a safety net for our children. Aspirational guidelines do not "give specific substantive content" to a constitutionally adequate education and "to the program [the legislature] deems necessary to provide that education." *Claremont II*, 142 N.H. at 475 (quotations omitted).

Without such a definition, the legislature cannot fulfill its mandate to determine the cost of providing a constitutionally adequate education to our children. As we stated in *Opinion of the Justices (Reformed School Financing Systems)*, 145 N.H. 474, 478 (2000): "It is not possible to determine the level of funding required to provide the children of this State with a constitutionally adequate education until its essential elements have been identified and defined." Thus, as the trial court observed, "While great latitude must be granted to the Legislature to develop a formula or methodology to compute [the cost of a constitutionally adequate education], it must fulfill its duty by, in fact, determining the cost in accordance with its definition of an adequate education."

As the trial court aptly found, the current education funding law, House Bill 616, is constitutionally infirm for just this reason—it is not tethered to a definition of a constitutionally adequate education. In the trial court's words, House Bill 616 does not "provide[] for a calculation of the cost of a[] [constitutionally] adequate education, per pupil or otherwise." Rather, it "arbitrarily establishes an amount to be dedicated to providing [such] an ... education." Because House Bill 616 is not linked to a definition of a constitutionally adequate education, I believe that the court should declare it facially unconstitutional.

It is the legislature's job, not ours, to define a constitutionally adequate education, and to determine the mechanism by which to fund it. *Claremont II*, 142 N.H. at 476-77. It is our job to determine whether the legislature has complied with its constitutional obligation. "[W]e were not appointed

to establish educational policy .... That is why we leave such matters, consistent with the Constitution, to the two co-equal branches of government." *Id.* at 475. Our sole duty is to "uphold and implement the New Hampshire Constitution." *Id.*

"While it is appropriate to give due deference to a co-equal branch of government as long as it is functioning within constitutional constraints, it would be a serious dereliction on our part to deliberately ignore a clear constitutional violation." *Baines v. N.H. Senate President*, 152 N.H. 124, 129 (2005) (quotation omitted). I believe that, by remanding to the superior court, or by appointing a special master, we risk usurping the legislature's prerogative to set educational and fiscal policy. Accordingly, I believe that we should declare House Bill 616 unconstitutional for the reasons the superior court sets forth in its decision. Once the legislature provides the children of this State with what it determines to be a constitutionally adequate education, the mandate of the constitution will be satisfied, and our role will be concluded.

I believe strongly that it is not our role to "sit in continuous judgment over educational policy decisions made by the legislature and the Governor." *Claremont School Dist.*, 147 N.H. at 524 (Nadeau and Dalianis, JJ., dissenting). Nor is it our role to judge the legislature's fiscal policy. *See id.* By retaining jurisdiction of this appeal, I believe that the majority moves us dangerously close to taking these policy-making roles for ourselves and deciding questions that are not ours to answer. *See Hughes v. Speaker, N.H. House of Representatives*, 152 N.H. 276, 283-88 (2005) (discussing political question doctrine).

For these reasons, respectfully, I concur in the majority's determination that the legislature has not defined a constitutionally adequate education and dissent from its decision to retain jurisdiction of this appeal indefinitely.