WATERMAN, J.
(concurring specially).
I concur in the majority’s well-reasoned decision on all issues. I write separately to emphasize the importance of judicial restraint when litigants ask courts to overstep their bounds.
*40 This case was resubmitted for a second oral argument because three new members were added to this court. Plaintiffs’ counsel in his eloquent oral argument urged our court to “do its job.” We do exactly that today by affirming the dismissal of a well-intentioned, but legally flawed lawsuit. If these individual plaintiffs were allowed to proceed with this case in the courts, and they somehow won the relief they seek, the end result would be judges running our public schools through structural injunctions that second-guess the educational policy decisions made by the elected branches of government. That is not our role. We do not sit as the supreme school board of the State of Iowa, and we are unwilling in the guise of adjudication to usurp powers the Iowa Constitution cedes to the elected branches to run our public schools. The separation-of-powers doctrine precludes the relief these plaintiffs seek from the courts.
To reinstate this lawsuit would set a dangerous precedent. These plaintiffs ask too much of our court jurisprudentially. It is not for courts to impose particular statewide educational standards by judicial decree. Our limited role as a coequal branch of government requires us to adjudicate cases and in doing so construe the meaning of our constitution; the constitutional power to run our public schools lies with the legislative and executive branches. Courts can and must step in if that power is exercised in a way that infringes on individual rights. See, e.g., Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 514, 89 S.Ct. 733, 740, 21 L.Ed.2d 731, 742 (1969) (holding First Amendment protection for symbolic speech required school officials to allow students to wear black armbands protesting the Vietnam War). Such cases involving individual rights áre well within the institutional competence of courts to decide. No such claim is stated in this case. Nor is this case another Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), challenging racial segregation or discrimination. No claim of disparate treatment or any illegal classification such as race is made here. Rather, these plaintiffs seek broad educational reform. Our courts are not institutionally competent to make educational policy judgments. The Department of Education is in the executive branch.
It is worth repeating here Justice Sca-lia’s recent warning against the use of structural injunctions in institutional reform litigation:
Structural injunctions ... turn[ ] judges into long-term administrators of complex social institutions such as schools, prisons, and police departments. Indeed, they require judges to play a role essentially indistinguishable from the role ordinarily played by executive officials....
The drawbacks of structural injunctions have been described at great length elsewhere. This case illustrates one of their most pernicious aspects: that they force judges to engage in a form of factfinding-as-policymaking that is outside the traditional judicial role. The factfinding judges traditionally engage in involves the determination of past or present facts based (except for a limited set of materials of which courts may take “judicial notice”) exclusively upon a closed trial record. That is one reason why a district judge’s factual findings are entitled to plain-error review: because having viewed the trial first hand he is in a better position to evaluate the evidence than a judge reviewing a cold record. In a very limited category of cases, judges have also traditionally been called upon to make some predictive judgments: which custody will best serve the interests of the child, for example, or whether a particular one-shot injunction will remedy the plaintiff’s grievance. When a judge *41 manages a structural injunction, however, he will inevitably be required to make very broad empirical predictions necessarily based in large part upon policy views — the sort of predictions regularly made by legislators and executive officials, but inappropriate for the Third Branch.
[[Image here]]
It is important to recognize that the dressing-up of policy judgments as factual findings is not an error peculiar to this case. It is an unavoidable concomitant of institutional-reform litigation. When a district court issues an injunction, it must make a factual assessment of the anticipated consequences of the injunction. And when the injunction undertakes to restructure a social institution, assessing the factual consequences of the injunction is necessarily the sort of predictive judgment that our system of government allocates to other government officials.
But structural injunctions do not simply invite judges to indulge policy preferences. They invite judges to indulge incompetent policy preferences. Three years of law school and familiarity with pertinent Supreme Court precedents give no insight whatsoever into the management of social institutions.
Brown v. Plata, — U.S. -, -, 131 S.Ct. 1910, 1953-55, 179 L.Ed.2d 969, 1015-16 (2011) (Scalia, J., dissenting) (citations omitted).
These admonitions apply with equal force here. A law degree and some court room experience do not qualify judges to restructure Iowa schools or impose new statewide educational standards. If we reinstate this case, one can easily imagine more lawsuits will be filed by other families with different ideas on how to run the schools. Whatever evidence the King plaintiffs might offer at a trial in this case presumably would make a record very different from the evidentiary trial record to be made by other plaintiffs with conflicting educational policy goals such as vouchers or greater local control. All such trials would be a waste of time and scarce resources in the absence of a cognizable claim upon which judicial relief may be granted.
We are affirming the dismissal of this case based on the plain meaning of our constitution and our own precedent. Sixteen years ago our court unanimously recognized that it is not our role to “develop or choose among schemes for public education” and that the proper forum for such debates is “in the other branches of state government.” Exira Cmty. Sch. Dist. v. State, 512 N.W.2d 787, 796 (Iowa 1994). This view is echoed by many other voices of restraint on the supreme courts of our sister states.[27]
*42 By contrast, instead of focusing on our own precedent, the dissent embarks on a wide-ranging survey of authorities. For example, the dissent cites several times to the United Nations’ 1948 Universal Declaration of Human Rights, a document that includes a right to leisure time and health care as well as a right to education. The dissent acknowledges this UN Declaration is not binding in United States courts. See Sosa v. Alvarez-Machain, 542 U.S. 692, 734-35, 124 S.Ct. 2739, 2767, 159 L.Ed.2d 718, 754-55 (2004). The only education case citing the UN Declaration was accompanied by a vigorous and well-reasoned dissent. Pauley v. Kelly, 162 W.Va. 672, 255 S.E.2d 859, 897-900 (1979) (Neely, J., dissenting). No party to this litigation cited the UN Declaration at any point in the proceedings or argued it had any relevance. I fail to see how a 1948 UN Declaration helps our court ascertain the intent of the framers of the Iowa Constitution ratified ninety years earlier. Our court has not previously relied on UN declarations or international law to interpret our 1857 constitution, and I would not start now.
The dissent also discusses numerous historical figures and famous educators. Yet none of them is quoted for the proposition that courts should be running schools. I imagine all of them would be surprised by that notion. The divergence of views of education surveyed by the dissent is another reason why policymaking should be left to the elected branches. How should an Iowa judge or jury in a contested case select from among the disparate academic viewpoints and standards? We all agree public education is vitally important. But that does not warrant courts interfering in how our public schools are run. The lengthy dissent cites no case from any jurisdiction where court-ordered imposition of statewide educational standards improved student outcomes.
The dissent argues we should not decide whether the amended petition states a claim upon which relief may be granted because the appellee who won dismissal below did not brief that alternative ground for dismissal on appeal. That issue was fully briefed by both sides in the district court and decided by the district court and is appropriately decided by our court today for the reasons set forth in the majority opinion and Chief Justice Cady’s special concurrence. The dissenters’ position today is at odds with their zeal a mere eighteen months ago to decide an issue the parties in another case failed to brief in district court or on appeal and that the district court never decided. See Feld v. Borkowski, 790 N.W.2d 72, 81-82 (Iowa 2010) (Wiggins, J., concurring specially); id. at *43 82-85 (Appel, J., concurring in part and dissenting in part). The dissenters argue it was appropriate to reach the issue omitted from the briefs in Feld because it was inextricably intertwined with the issue briefed on appeal. The same is true in this case — whether these plaintiffs allege claims upon which judicial relief may be granted or rather nonjusticiable political questions is simply two sides of the same coin. Notably, in Feld, Justice Wiggins posed several questions that are better asked in this case:
Why should we leave the question unanswered when the district court will be confronted with it on remand? Why are we creating a potential appeal on this issue ... when we can answer the question now? It seems to me, for us not to address the issue creates extra expense for the parties and the court. Accordingly, I would address the issue head on and give the contact sports exception a proper burial.
Id. at 82. So too should we give plaintiffs’ case “a proper burial” now, instead of remanding for a costly trial to prove allegations that, if true, provide no grounds for judicial relief.[28]
Many generations of Iowans have been justifiably proud of the quality of our state’s public school system. The allegations in this lawsuit shine a light on shortcomings, disturbing downward trends, and outcomes that vary from district to district. But notably absent in the voluminous filings in this appeal is any convincing argument judicial intervention will make Iowa schools better. Plaintiffs filed no Brandéis brief providing empirical data that their requested judicial intervention would improve educational outcomes. The plaintiffs in this case are no doubt optimistic and sincere in their beliefs that the educational reforms they seek to impose statewide by judicial fiat will raise ACT scores in many districts. Our courts, however, are not competent to determine whether a structural injunction imposing a new set of priorities and standards will accomplish those worthy goals or instead lower composite average ACT scores in districts that currently must be doing many things right.
Voters elect our governor, legislators, and school board members. If these plaintiffs do not like how Iowa schools are run, they should turn to the ballot box, not the courts.

. See, e.g., Comm, for Educ. Rights v. Edgar, 174 I11.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178, 1189 (1996) ("[Q]uestions relating to the quality of education are solely for the legislative branch to answer.”); Hombeck v. Somerset Cnty. Bd. of Educ., 295 Md. 597, 458 A.2d 758, 790 (1983) ("The quantity and quality of educational opportunities to be made available to the State’s public school children is a determination committed to the legislature or to the people-”); Neb. Coal, for Educ. Equity & Adequacy v. Heineman, 273 Neb. 531, 731 N.W.2d 164, 181 (2007) ("[I]t is beyond our ken to determine what is adequate funding for public schools. This court is simply not the proper forum for resolving broad and' complicated policy decisions or balancing competing political interests.”); Londonderry Sch. Dist. SAU No. 12 v. State, 154 N.H. 153, 907 A.2d 988, 996 (2006) (noting "concern that this court or any court not take over the legislature’s role in shaping educational and fiscal policy”); Okla. Educ. Ass’n v. State ex rel. Okla. Legislature, 158 P.3d 1058, 1066 (Okla.2007) (”[T]he important role of education in our society does not allow us to override the constitutional restrictions placed on our judicial authority.”); Marrero ex rel. Tóbalas v. Commonwealth, 559 Pa. 14, *42 739 A.2d 110, 113-14 (1999) ("[Tjhis court is ... unable to judicially define what constitutes an 'adequate' education or what funds are ‘adequate’ to support such a program.”); City of Pawtucket v. Sundlun, 662 A.2d 40, 62 (R.I.1995) (”[T]he level of state educational funding is largely a matter for the Legislature, which possesses the 'expertise and familiarity with local problems implicated in the raising and disposition of public revenues associated with public education.’ ” (quoting Hornbeck, 458 A.2d at 786)); Abbeville Cnty. Sch. Dist. v. State, 335 S.C. 58, 515 S.E.2d 535, 541 (1999) (“We do not intend the courts of this State to become super-legislatures or super-school boards.”); Kukor v. Grover, 148 Wis.2d 469, 436 N.W.2d 568, 583 (1989) ("Because issues such as equality in education are peppered with political perceptions and emotionally laden views, we have carefully restrained our consideration of the constitutional issues before us....”); see also San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 42, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16, 48 (1973) ("In addition to matters of fiscal policy, this case also involves the most persistent and difficult questions of educational policy, another area in which this Court’s lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels.”).

. Justice Wiggins' dissent asserts our majority decision "appears to overrule” Racing Ass’n of Central Iowa v. Fitzgerald (RACI II), 675 N.W.2d 1 (Iowa 2004). RACI II as a practical matter has been limited to its facts. I would expressly overrule RACI II as plainly erroneous. The RACI II majority, purporting to apply the federal rational-basis test, held that a tax differential for casino slot machine revenue violated the equal protection clause of the Iowa Constitution on remand after the unanimous United States Supreme Court had held the differential did not violate federal equal protection. 675 N.W.2d at 3. The RACI II majority thereby essentially took the position that the nine justices of the United States Supreme Court were irrational in applying the same rational-basis test in the same case, despite the well-settled and long-standing tradition of judicial deference to legislative economic regulation and tax classifications. RACI II was wrongly decided for the reasons set forth in the eloquent separate dissents by Justices Cady and Carter. See id. at 16-17 (Carter, J., dissenting); id. at 17-28 (Iowa 2002) (Cady, J., dissenting); see also Racing Ass'n of Cent. Iowa v. Fitzgerald (RACI I), 648 N.W.2d 555, 563-64 (Iowa 2002) (Neuman, J., dissenting, joined by Carter and Cady, JJ.); Fitzgerald v. Racing Ass’n of Cent. Iowa, 539 U.S. 103, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003) (reversing RACI I on federal equal protection grounds).